752 F.2d 1009
 12 Collier Bankr.Cas.2d 20, 12 Bankr.Ct.Dec. 1102,
Bankr. L. Rep. P 70,280
 In the Matter of QUALITY HOLSTEIN LEASING, Debtor.
Timothy J. VINEYARD, Trustee of Quality Holstein Leasing,
Inc., Plaintiff-Appellee-Cross-Appellant,
v.
Clayton McKENZIE, et al., Defendants,
Borg-Warner Acceptance Corp., Defendant-Appellant-Cross-Appellee.
 No. 84-1175.
 United States Court of Appeals,
Fifth Circuit.
 Feb. 11, 1985.
 
 Locke, Purnell, Boren, Laney & Neely, Andrew Barr, Barbara J. Houser, Karen P. Jones, Dallas, Tex., for defendant-appellant-cross-appellee.
 Haynes & Boone, Robin E. Phelan, Robert D. Albergotti, Andrew A. Cuomo, Dallas, Tex., for plaintiff-appellee-cross-appellant.
 Appeals from the United States District Court for the Northern District of Texas.
 Before GEE, WILLIAMS and JOLLY, Circuit Judges.
 JERRE S. WILLIAMS, Circuit Judge:
 
 
 1
 Appellant Borg-Warner Leasing challenges a summary judgment awarded appellee Timothy J. Vineyard, as trustee of the bankruptcy estate of Quality Holstein Leasing, Inc. (QHL). The judgment gave the trustee legal and equitable ownership of property that Borg-Warner claims QHL obtained from one of Borg-Warner's debtors, Clayton McKenzie, in order to defraud Borg-Warner. The bankruptcy and district courts both held that the trustee could take the property for the benefit of the estate pursuant to his "strong-arm" powers under the Bankruptcy Code[1] whether or not QHL's or McKenzie's acts constituted fraud. Borg-Warner, which holds an unperfected security interest in the property, contends that the strong-arm provisions of the Code do not apply; it asserts that the property never entered QHL's estate because Texas law impressed a constructive trust upon the property. Although our analysis differs from the district court's, we affirm.
 
 
 2
 In 1978, Borg-Warner financed McKenzie's purchase of a Piper Navaho aircraft, taking and perfecting a security interest in the Navaho at the time. Although McKenzie and his wife owned all the stock of QHL, he took title to the airplane in his own name.[2] Two years later, McKenzie proposed to trade the Navaho for a Piper Seneca and to pay cash for the excess of the price over the trade-in value of the Navaho. McKenzie, Borg-Warner, the dealer, and a Tennessee bank that had financed the dealer's original purchase of the Seneca accordingly entered into a swap agreement. In particular, Borg-Warner and the bank devised a procedure to preserve their perfected security positions. The bank undertook to execute and deliver to Borg-Warner a release of its (the bank's) lien on the Seneca. Borg-Warner promised in return to release its lien on the Navaho. Both the bank and Borg-Warner intended to perfect their security interests respectively in the Navaho and Seneca by filing the necessary documentation with the Federal Aviation Administration (FAA) in Oklahoma City.[3] Simultaneously with those filings, each would lodge the other's release of lien. The parties having made the necessary arrangements, McKenzie traded the Navaho for the Seneca, which he registered in his own name with the FAA.
 
 
 3
 About seven months after the bank and Borg-Warner exchanged releases of lien, a series of transactions and omissions left Borg-Warner with only an unperfected security interest in the Seneca. The chief omission involved Borg-Warner's filings. Either the company failed to send the documents that Borg-Warner needed to supply in order to perfect its lien, or the FAA misplaced them. The company discovered the error in the spring of 1981, but for some time it placed reliance on the bank's Seneca lien, which remained of record at the FAA, to preserve its perfected security position.
 
 
 4
 Events occurring in June 1981 form the basis of Borg-Warner's allegations of fraud. On June 12, the FAA recorded the bank's release of lien. The bank denies executing and Borg-Warner denies sending the release,[4] and nothing in the record indicates who did give it to the FAA. On the same day, the FAA recorded an instrument transferring title of the Seneca to QHL. The document bore McKenzie's signature in his capacity as president of QHL. McKenzie had promised Borg-Warner that he would take title in his personal capacity, and he had originally done so.
 
 
 5
 Borg-Warner belatedly sent additional documentation to the FAA in an effort to perfect its security interest. On the day before the FAA received the filing, however, QHL filed a voluntary petition under Chapter 11 of the Bankruptcy Code. Filing the petition rendered nugatory Borg-Warner's attempt to perfect its lien. See Bankruptcy Code, 11 U.S.C. Sec. 362(a)(4) (1982) (automatically staying "any act to ... perfect ... any lien against property of the estate").
 
 
 6
 Trustee Vineyard soon initiated the bankruptcy court proceedings that led to this appeal. He did so by filing an adversarial claim seeking the court's permission to sell the Seneca for the benefit of the bankruptcy estate. Borg-Warner did not object to the sale but argued that it had a security interest in the airplane superior to the trustee's and thus should receive first the amount of its lien from the proceeds of any sale. The company grounded its claim on allegations that McKenzie, QHL, or both had defrauded it by filing the June 12 release of lien without the Tennessee bank's consent and by registering the Seneca in QHL's name.[5] Borg-Warner contended that under 11 U.S.C. Sec. 541 (1982), the Seneca did not enter the estate because Texas law impressed it with a constructive trust that defeated the trustee's claim as a lienholder. The bankruptcy court, however, held that the trustee's strong-arm powers under 11 U.S.C. Sec. 544 (1982), made "the existence of fraud ... irrelevant in that the Trustee would not be bound by any assertion by Borg-Warner ... of fraud." The district court affirmed on similar grounds.
 
 
 7
 This appeal requires us, first, to assess the manner in which sections 541 and 544 interact and, second, to determine whether the interaction permits Borg-Warner to prevail on its claim. We agree with Borg-Warner that section 544 does not entitle a trustee to retain for the benefit of the estate all property regardless of the means--fair or foul--by which the debtor obtained it. We also agree with the trustee, however, that Borg-Warner's allegations of fraud, even if true, do not establish an interest in the Seneca that entitled the company to assert a lien superior to the trustee's.
 
 
 8
 We start with the proposition that imposition of a constructive trust under state law upon a bankruptcy debtor's property generally confers on the true owner of the property an equitable interest in the property superior to the trustee's. As we recently stated in construing section 541(d):[6]
 
 
 9
 With regard to property held by [a] trustee, "[t]he rule is elementary that the estate succeeds only to the title and rights in the property that the debtor possessed, although the trustee is armed, of course, with the special rights and powers conferred upon him by the Code itself. Therefore ..., the estate will generally hold such property subject to the outstanding interest of the beneficiaries."
 
 
 10
 Georgia Pacific Corp. v. Sigma Service Corp., 712 F.2d 962, 968 (5th Cir.1983) (quoting 4 Collier on Bankruptcy p 541.13, at 541-66 (15th ed. 1983)). The Georgia Pacific panel also interpreted section 541(d) to require the trustee to turn over to the beneficiary of a state law constructive trust the property that the debtor holds subject to such a trust. 712 F.2d at 968. The debtor retains legal title, but the constructive trust beneficiary may reclaim in full his equitable interest in bankruptcy proceedings.
 
 
 11
 The impact of section 544 on the result Georgia Pacific and other cases have reached under section 541 and its predecessor provisions nonetheless remains unclear. Section 544 gives a bankruptcy trustee, as of the petition date, the status of a judicial lienholder, a creditor with an unsatisfied execution, and a bona fide purchaser of real property.[7] These strong-arm provisions confer on the trustee a well-nigh ideal lienholder status, allowing him to retrieve or retain property the creditors otherwise could remove from the estate or keep.[8]
 
 
 12
 Without considering the strong-arm provisions, courts have agreed with the decision in Georgia Pacific in cases that arose under the old bankruptcy statute. See In re Morales Travel Agency, 667 F.2d 1069, 1071 (1st Cir.1981) ("In the case of property held by the bankrupt in trust for another, the trustee would acquire the property subject to the interests of the trust beneficiary."); In re Teltronics, Ltd., 649 F.2d 1236, 1239 (7th Cir.1981); In re Kennedy & Cohen, Inc., 612 F.2d 963, 965 (5th Cir.) (per curiam) (holding that "[p]roperty held by a bankrupt in [constructive] trust belongs to the beneficiary and never becomes a part of the bankruptcy estate"), cert. denied sub nom. Wisconsin v. Reese, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980); In re Paragon Securities Co., 589 F.2d 1240, 1242 (3d Cir.1978). Courts have reached the same result in Code cases. See In re Flight Transportation Corp. Securities Litigation, 730 F.2d 1128, 1136 (8th Cir.1984), petition for cert. filed, --- U.S. ----, 105 S.Ct. 378, 83 L.Ed.2d 314, (U.S.1984); cf. United States v. Whiting Pools, Inc., 462 U.S. 198, --- n. 10, 103 S.Ct. 2309, 2313 n. 10, 76 L.Ed.2d 515 (1983) ("We do not now decide the outer boundaries of the bankruptcy estate [but] note only that Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition."). Whether section 544 overrides the exclusionary effect of section 541 in the instance of a valid constructive trust created under state law is our first issue.
 
 
 13
 As a general rule, it must be held that section 541(d) prevails over the trustee's strong-arm powers. Although those powers allow a trustee to assert rights that the debtor itself could not claim to property, Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own.[9] Where state law impresses property that a debtor holds with a constructive trust in favor of another, and the trust attaches prior to the petition date, the trust beneficiary normally may recover its equitable interest in the property through bankruptcy court proceedings.[10]
 
 
 14
 The remaining issue concerns whether the fraud that Borg-Warner alleges provides grounds for imposing a constructive trust on the Seneca, thus allowing only legal title to pass into the QHL estate. Borg-Warner argues that QHL's acts of fraud warrant decreeing that equitable remedy. Even assuming that Texas law would permit impression of a constructive trust, however, we disagree with the conclusion that Borg-Warner may overcome the trustee's strong arm.
 
 
 15
 The crucial datum in this case is the nature of Borg-Warner's claim to the Seneca. The company does not assert ownership but contends that QHL's fraud prevented it (QHL) from obtaining equitable title to the airplane. Thus, Borg-Warner contends that equitable title remained in McKenzie, the true owner, because Texas law impressed the property with a constructive trust in his favor. Borg-Warner concludes that proof of its allegations would require the bankruptcy court to hold that QHL's estate had no equitable interest in the Seneca. Borg-Warner then could assert its rights as a creditor directly against McKenzie.
 
 
 16
 We believe that Borg-Warner misconceives the function of the trustee's strong-arm powers. They serve essentially to marshal all of the debtor's assets, including some that the debtor itself could not recover, in order to enhance the resources available to the pool of creditors. See generally, e.g., Jackson, Avoiding Powers in Bankruptcy, 36 Stan.L.Rev. 725, 732 (1984) ("The basis of those avoiding powers is to protect the advantages of bankruptcy's collective proceeding.") Exercise of the powers allows the estate to avoid, among other interests, secret or otherwise unperfected liens on property that the debtor appears to own on the petition date.
 
 
 17
 Borg-Warner concedes that its status as a holder of an unperfected security interest places it squarely within the ambit of the trustee's strong-arm authority. E.g., In re Fretz Co., 565 F.2d 366, 374 (5th Cir.1978) (holding that failure to perfect security interest allows trustee to avoid superiority of claim). Yet it cannot satisfactorily explain why it should receive different treatment on account of QHL's alleged fraud. Borg-Warner does not claim that QHL defrauded it of its property but that QHL duped McKenzie into transferring the Seneca to QHL. Fraud such as that may preserve the true owner's equitable interest, but it does not improve the status of a creditor of the bankruptcy creditors. One who claims an interest in estate property through the beneficiary of a constructive trust, in other words, may not thus avoid the trustee's strong-arm powers. Section 544 prevents such piggy-backing.[11]
 
 
 18
 A contrary holding would lead to untoward results and hinder the purposes of section 544. It seems likely that creditors of third parties from whom a debtor fraudulently procured property would unduly burden the bankruptcy courts with claims similar to Borg-Warner's. Such claims would prove no less insidious to the orderly workings of the bankruptcy structure than the hidden interests and unperfected liens that section 544 in the main authorizes the trustee to avoid. The policy consists in doing equity among creditors. Remote creditors such as Borg-Warner should do no better than direct but unperfected security holders.
 
 
 19
 In summary, we find that the courts below erred in concluding that section 544 empowers a bankruptcy trustee to retain for the benefit of the estate property that the debtor obtained by fraud and upon which state law has imposed a valid constructive trust. We also conclude, however, that any fraud by QHL upon McKenzie conferred on Borg-Warner no rights in addition to those flowing from its status as a holder of an unperfected security interest in property that it alleges QHL fraudulently obtained. Section 544 gives the trustee authority to avoid such remote claims. Thus, no issue of material fact prevented summary judgment. In the ultimate reorganization of QHL, Borg-Warner's claim to the Seneca will stand on no better grounds than those of QHL's other unperfected, secured creditors.[12]
 
 
 20
 AFFIRMED.
 
 
 
 [1]
 Bankruptcy Reform Act of 1978, 11 U.S.C. Secs. 101-151326 (1982). The recent changes in the Bankruptcy Code, see Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98-353, 98 Stat. 333 (1984), reprinted in 1984 U.S.Code Cong. & Ad.News 576, do not affect this case, see id. Sec. 553 (prescribing effective date of amendments)
 
 
 [2]
 The record indicates that the McKenzies resided and QHL based its operations in Palestine, Texas
 
 
 [3]
 Pursuant to 49 U.S.C. Sec. 1403 (1982), the FAA maintains a national system for recording interests in civil aircraft. Texas law requires creditors who claim a security interest in such aircraft to file the documents that Sec. 1403 demands in order to perfect their security position. Tex.Bus. & Com.Code Ann. Sec. 9.302(d) (Vernon 1968) ("A security interest in property covered by a [federal] statute described in Subsection (c) can be perfected only by registration or filing under that statute ....") A creditor's failure so to perfect subordinates his security interest to the claim a "lien creditor", among others. See id. Sec. 9.301
 
 
 [4]
 The bank had earlier executed a release, but the one that the FAA recorded bore a considerably later date
 
 
 [5]
 Borg-Warner's failure to specify the individual or entity that it claims committed the fraud has hampered our ability to analyze the issues. The company appears at times to contend that McKenzie defrauded QHL into taking title to the Seneca, but practicing fraud upon the debtor hardly constitutes grounds for imposing a constructive trust in favor of the defrauding party. See, e.g., Stone v. Parker, 446 S.W.2d 734, 737 (Tex.Civ.App.--Houston 1969, writ ref'd n.r.e.) ("[A] court of equity will not aid the fraudulent grantor in seeking a recovery of the property."). Thus, if we correctly perceive Borg-Warner's allegations of fraud, the company has no grounds for claiming that the Seneca never entered the QHL estate
 To assert a claim at all, then, Borg-Warner must argue that QHL defrauded McKenzie. The notion seems to us whimsical: McKenzie and his wife together owned QHL, and he served as its president. That his own company fooled him appears most doubtful. Although we view such a proposition with great skepticism, resolution of the issue would involve factual questions that Fed.R.Civ.P. 56(c) bars courts from determining on motion for summary judgment. Accordingly, we address the issues as if Borg-Warner has properly raised the question of fraud.
 We nonetheless note that the substance of Borg-Warner's grievance appears not to lie in claims of common law fraud but in allegations of a fraudulent transfer. Assuming the insolvency of McKenzie, whom his creditors have subjected to involuntary bankruptcy proceedings, a creditor such as Borg-Warner could raise such a claim under Texas law. See Tex.Bus. & Com.Code Ann. Secs. 24.01-.05 (Vernon 1968) (voiding certain transfers that prejudice the rights of creditors, among others). If the company proved that McKenzie fraudulently transferred the Seneca to QHL, Texas law would set aside the conveyance, and equitable title would remain in McKenzie so that his creditors could claim against the property that he had fraudulently transferred to QHL. Borg-Warner arguably has raised a fraudulent conveyance claim but only in the vaguest terms. The company did not cite the controlling statute, nor did it use fraudulent conveyance terminology. Moreover, such a claim conflicts with its assertion that it does not present its own rights as a creditor of McKenzie but raises the right of McKenzie to return of the Seneca. We do not, therefore, consider a fraudulent conveyance claim except to observe that it would not affect our decision in this case.
 
 
 [6]
 That subsection provides as follows:
 (d) Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.
 11 U.S.C. Sec. 541(d) (1982).
 
 
 [7]
 Section 544(a) confers strong-arm powers on a trustee in the following terms:
 (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of the debtor or any obligation incurred by the debtor that is voidable by--
 (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists;
 (2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; and
 (3) a bona fide purchaser of real property from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser at the time of the commencement of the case, whether or not such a purchaser exists.
 
 
 [8]
 The paradigm strong-arm situation arises where, as in this case, the trustee seeks to avoid the security interest of a creditor that has failed to perfect its secured position. The trustee's lienholder status under section 544 makes him a "lien creditor" within the meaning of Tex.Bus. & Com.Code Sec. 9.301 (Vernon 1968), and the failure to perfect renders the creditor's position subordinate to the trustee's, id.; see supra note 3. The creditor's security interest remains enforceable against the debtor, but the creditor loses his preference over other creditors. See In re Vintero Corp., 735 F.2d 740, 742 (2d Cir.1984) ("The security interest need not be perfected to be enforceable against the debtor; perfection is important only insofar as adverse third parties have entered the picture.") (quoting Clark, The Law of Secured Transactions under the Uniform Commercial Code p 3.2, at 3-8 (1980))
 
 
 [9]
 The otherwise unrevealing legislative history of Sec. 541(d) indicates congressional intent as follows:
 Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in constructive trust for the person to whom the bill was owed.
 S.Rep. No. 989, 95th Cong., 2d Sess. 82, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5868.
 Senator Dennis DeConcini, a leading proponent of the new bankruptcy statute, characterized the function of Sec. 541(d) in similar terms:
 Thus, as section 541(a)(1) clearly states, the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate except to the extent that defenses which are personal against the debtor are not effective against the estate.
 
 
 [124]
 Cong.Rec. 33989, 33999 (1978) (statement of Senator DeConcini immediately before Senate adoption of House amendments)
 
 
 [10]
 We emphasize that section 541(d) overcomes the trustee's section 544 powers only where state law confers equitable title on a third party effective prior to the commencement of the bankruptcy case. The strong-arm provisions give the trustee his idealized lienholder status as of that time, so property rights that attached before the petition date may supersede the trustee's lien creditor position under section 544. State law defining property rights may not, of course, go so far as to manipulate bankruptcy priorities, see generally Jackson, Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain, 91 Yale L.J. 857, 901-06 (1982), but this case does not present such a situation. For discussion of the role that pre-Code bankruptcy law permitted state property law to play in determining creditors' rights, see Countryman, The Use of State Law in Bankruptcy Cases (Parts I & II), 47 N.Y.U.L.Rev. 407 & 631 (1972)
 In a proper case, the entitlement that Texas constructive trust law establishes would permit a third party from whom a debtor fraudulently obtained property to avoid the trustee's strong arm. In Meadows v. Bierschwale, 516 S.W.2d 125, 133 (Tex.1974) (Johnson, J.), the court held that such fraud gives the defrauded party the status of a lien creditor and impresses a constructive trust upon the property "when legal title passes...." Id. (holding that beneficiary of constructive trust has interest superior to unperfected security interest holder). Under Texas law and Code Sec. 541(d) then, property that a debtor fraudulently obtained prior to the petition date enters the bankruptcy estate only to the extent of legal title unless the constructive trust beneficiary fails to assert his equitable interest.
 
 
 [11]
 Cf. In re MortgageAmerica Corp., 714 F.2d 1266 (5th Cir.1983) (holding that creditor of debtor could not sue owner of debtor firm on denuding the corporation and fraudulent conveyance causes of action because, under Sec. 541, those claims belonged to the estate, and Sec. 362 thus automatically stayed creditor's action against owner)
 
 
 [12]
 We express no opinion regarding the ability of the trustee in McKenzie's bankruptcy case to claim an interest that the trustee in this case may not avoid under Sec. 544