#### In re EARL ROGGENBUCK FARMS, INC., Debtor.

**Richard S. COOK, Trustee, Plaintiff,**

v.

**UNITED STATES of America, acting Through the COMMODITY CREDIT CORPORATION, and Earl S. Roggenbuck, individually, Defendants.**

Bankruptcy No. 84–09233 (Formerly No. 82–00280).

Adv. No. 84–9067 (Formerly No. 84–9009).

United States Bankruptcy Court, E.D. Michigan, N.D.

Aug. 8, 1985.

Lambert, Leser, Hebert, Dahm, Giunta & Cook, P.C. by Mark Smith, Bay City, Mich., for defendant Roggenbuck.

Hertzberg, Jacob & Weingarten, P.C. by JoAnn C. Stevenson, Detroit, Mich., for plaintiff Trustee.

Robert D. Martinez, Asst. U.S. Atty., Bay City, Mich., for defendant U.S.A.

## MEMORANDUM OPINION

ARTHUR J. SPECTOR, Bankruptcy Judge.

### I. DESCRIPTION OF THE PROCEEDINGS

This adversary proceeding was filed by the former Chapter 11 debtor Earl Roggenbuck Farms, Inc. and its principal shareholder, Earl Roggenbuck, on January 19, 1984. On March 27, 1984, Richard S. Cook was appointed Chapter 11 trustee. After the bankruptcy case was converted to Chapter 7 on June 15, 1984, and Mr. Cook was appointed the Chapter 7 trustee, he became a party plaintiff and Earl Roggenbuck was redesignated as a party defendant. This occurred on September 12, 1984, when the trustee filed his first amended complaint.[1] The trustee seeks to recover from the Commodity Credit Corporation (CCC) proceeds of corn which he alleges was the property of the debtor corporation but which the CCC took and sold in satisfaction of a loan it made to Earl Roggenbuck personally. On February 4, 1985, the trustee filed a motion for partial summary judgment. On March 13, 1985, the CCC filed a motion for partial summary judgment. On April 11, 1985 the plaintiff filed a second amended complaint, and on April 18, filed a second motion for partial summary judgment and a motion for dismissal of a "third-party" claim filed by the CCC against the debtor as part of its answer to the second amended complaint; these motions were scheduled to be heard at one hearing. On April 29, 1985, the attorney for Roggenbuck filed an answer to the cross-claim raised by the CCC in its answer to the second amended complaint; this pleading, filed on behalf of both Roggenbuck and ostensibly the debtor corporation, requested that both the third-party complaint and the cross-claim be dismissed.[2]

---

1. First National Bank of Bad Axe, which was initially a defendant in this proceeding, was not included as a party in the amended complaint, and does not further appear as a party herein. Since the bank had filed an answer on February 7, 1984, leave of court was necessary for it to be dismissed as a party; no order to this effect was entered. Nonetheless, we will deem the claim against the bank to have been validly dismissed without prejudice, and this opinion has no effect on any rights which the bank may have in the proceeds.

2. On June 17, 1985, Earl Roggenbuck also filed a separate motion to dismiss the cross-claim against him.

Shortly before the hearing on the various motions was to take place, the parties informed the Court that a settlement was likely, but because local counsel for the CCC did not have the authority to finalize the agreement, the offer had to be submitted to Washington, D.C. Since the government's decision could not be expected for four to six weeks, and since a settlement would inure to the benefit of all the parties, the hearing was adjourned and rescheduled for June 5, pending approval or rejection of the agreement.

In late May the parties received word that the settlement offer had been rejected, and the instant hearing was re-set. No affidavits or other admissible documents in opposition to the trustee's motion had been filed by the CCC by the time the hearing commenced, although it had filed a memorandum of law with regard to its answer and affirmative defenses in response to the plaintiff's second amended complaint. In the absence of any evidence contravening the plaintiff's proofs, the Court was on the verge of granting the trustee's motion when the CCC produced the affidavits of two of its agents, which bore the execution date of April 19, 1985. During the 48-day period between their execution and the hearing, the affidavits had been in the possession of the government's attorney. The plaintiff immediately objected to the admission of the affidavits on the grounds that they were untimely filed pursuant to F.R. Civ.P. 56(c) and 6(d).[3] As it was apparent that resolution of this procedural question could well be determinative of all of the substantive motions (i.e., if the affidavits were excluded, the plaintiff's motion for summary judgment would be granted; if they were admitted, the CCC could probably withstand the motion, and the matter would proceed to trial), the matter was taken under advisement and the parties were asked to brief the issue. Having read those briefs and given the matter further consideration, we hold that the affidavits should not be admitted.

The affidavits are without a doubt material, and indeed, critical to the government's case; they support the CCC's only claim that would entitle it to retain the proceeds herein. The bare bones of that claim are contained in the government's third-party complaint against Earl Roggenbuck Farms, Inc. It contends that Earl Roggenbuck obtained money from the government by means of fraudulent misrepresentations, i.e., that he led the agents of the CCC to believe that the corn pledged as security for the instant loan transaction belonged to him personally rather than to the debtor corporation in which he is the primary shareholder and officer. The government then argues that the traditional elements required for the establishment of a constructive trust exist here. It alleges that the corporate debtor was the beneficiary of the ill-gotten loan because those funds were used to pay off another lien on its corn. It further contends that when the debtor filed its petition for bankruptcy relief, the estate succeeded to the debtor's interest in the corn, subject to any defenses which could be asserted against the debtor. The CCC eventually hopes to prove that the fraudulently obtained funds are traceable directly to the proceeds of the corn and, since the corporation (and therefore the estate) was a transferee that gave no consideration for the property, those proceeds should be imposed with a constructive trust.

■ The government's affirmative defense raises intriguing issues regarding the interplay between the trustee's "strong arm" lien avoidance powers and the rights of creditors holding an equitable claim under state law. By virtue of 11 U.S.C.

---

**3.** Strictly speaking, F.R.Civ.P. 56(c) and 6(d) do not apply to bankruptcy proceedings. F.R. Civ.P. 81(a)(1) states that "these rules do not apply to proceedings in bankruptcy ... except insofar as they may be made applicable thereto by rules promulgated by the Supreme Court of the United States." Rule 56 is incorporated by the Bankruptcy Rules by Rule 7056. Rule 6(d) is not incorporated directly in the part of the rules dealing with adversary proceedings; instead, it appears as Bankruptcy Rule 9006(d) which contains language identical to 6(d). For the purposes of analysis, then, jurisprudence under the Federal Rules of Civil Procedure is applicable to this discussion.

§ 544(a), of course, the trustee is empowered to avoid any unsecured lien on property of the estate; Congress granted this power to the trustee to enable him or her to collect all assets which should be available for distribution to creditors. Moreover, to the extent that the trustee utilizes § 544(a) to enhance the value of estate property, the party seeking to prevent avoidance of its interest may not raise any misconduct or malfeasance by the debtor as a defense. *In re Gustav Schaefer Co.,* 103 F.2d 237 (6th Cir.1939), *cert. denied,* 308 U.S. 579, 60 S.Ct. 96, 84 L.Ed. 485 (1939); *In re Best Pack Seafoods, Inc.,* 29 B.R. 23 (Bankr.D.Me.1983). The trustee, in his capacity as trustee, is not estopped by the debtor's misconduct. *In re Great Plains Western Ranch Co., Inc.,* 38 B.R. 899, 11 B.C.D. 894 (Bankr.C.D.Cal.1984).

■ This does not mean, however, that the trustee has an unfettered right to all property held or claimed by the debtor regardless of the means, fair or foul, by which the debtor acquired that property. The trustee's powers in § 544(a) must be read in conjunction with 11 U.S.C. § 541(d), which states:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

The effect of this provision is that the interest in property to which the trustee succeeds can be no greater than that which the debtor itself had. *Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962 (5th Cir.1983); 4 *Collier on Bankruptcy,* ¶ 541-13, 541-66 (15th ed. 1983). Thus, if a creditor holds an equitable interest in property, the trustee may not avoid that interest by resorting to § 544(a). *In re Quality Holstein Leasing,* 752 F.2d 1009, (5th Cir.1985).

■ A constructive trust is a classic example of an equitable interest in property. The party requesting such relief admits that the legal title to property may be in another; but because the property was wrested from the movant by improper means, a court of equity should invoke a legal fiction and declare that the current owner holds only bare legal title for the benefit of the injured party. *Arndt v. Vos,* 83 Mich.App. 484, 268 N.W.2d 693 (1978); 22 M.L.P., *Trusts* § 51 (West, 1958).[4] Courts have recognized that a creditor of the estate who can prove the elements necessary to establish a constructive trust under state law may withstand the trustee's attempts to avoid the creditor's interest. *In re Quality Holstein Leasing, supra.*

Thus, the CCC's theory does have some merit as a plausible affirmative defense to the trustee's demand for return of the proceeds if it can prove the existence of facts which would give rise to a constructive trust under Michigan law. But before the government may have an opportunity to make its case, it must survive the trustee's motion for summary judgment.

## II. EXCUSABLE NEGLECT

■ In attempting to respond to the trustee's objection to admission, the government offered no extraordinary circumstances which precluded it from submitting the affidavits to the Court and opposing counsel. Instead, the failure to do

---

**4.** An alternative fiction by which to analyze this remedy is that when a constructive trust exists, the property held in trust never becomes part of the constructive trustee's, or debtor's, estate at all. *See, e.g., Selby v. Ford Motor Co.,* 590 F.2d 642 (6th Cir.1979). The difference in analysis is merely semantic. Whereas the former Bankruptcy Act of 1898, as amended, 11 U.S.C. §§ 1–1103 (repealed) which was applicable in *Selby,* stated that property of the estate did not include property subject to trusts, the approach in the Bankruptcy Code is that everything comes into the estate, albeit subject to valid liens, encumbrances and trust interests per § 541(a).

so was claimed to be totally inadvertent. The Assistant U.S. Attorney candidly admitted that he was theretofore ignorant of the requirement that affidavits be submitted at least one day prior to a hearing and that had he been aware of it, he most certainly would have complied. Counsel further represented that the last-minute production of the affidavits was in no way intended to surprise the plaintiff. The plaintiff does not contend that the government's conduct was intentional or meant to prejudice him. In short, we find that counsel simply did not know the rule existed.

F.R.Civ.P. 56(c), as incorporated into the Bankruptcy Rules by Rule 7056, states as follows:

> The motion shall be served at least 10 days before the time fixed for the hearing. *The adverse party prior to the day of hearing may serve opposing affidavits.* The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

(Emphasis added). This provision should be read in conjunction with Rule 6(d), or its bankruptcy equivalent, Rule 9006(d), which in relevant part states that:

> When a motion is supported by affidavit, the affidavit shall be served with the motion; and ... opposing affidavits may be served not later than 1 day before the hearing, unless the court permits them to be served at some other time.

Thus the CCC was required to file its affidavits at least one day before the hearing on the motion for summary judgment. Since it did not do so, it was in violation of the rules and the proffered affidavits should not ordinarily be admitted for consideration. There is only one loophole through which the CCC may pass the documents: under F.R.Civ.P. 6(b)(2), which is copied by Bankruptcy Rule 9006(b)(1), the

Court may extend the time period for filing documents "where the failure to act was the result of excusable neglect."

■ The determination of what actions constitute "excusable neglect" is a matter left to the discretion of the trial judge; Wright & Miller, *Federal Practice & Procedure*, § 1170 (1969); *Wood v. Santa Barbara Chamber of Commerce*, 705 F.2d 1515 (9th Cir.1983), *cert. denied*, ─── U.S. ───, 104 S.Ct. 1446, 79 L.Ed.2d 765 (1984); *Woods v. Allied Concord Financial Corp.*, 373 F.2d 733 (5th Cir.1967); *Beaufort Concrete Co. v. Atlantic States Construction Co.*, 352 F.2d 460 (5th Cir.1965), *cert. denied*, 384 U.S. 1004, 86 S.Ct. 1908, 16 L.Ed.2d 1018 (1966). Although the decision to grant or deny leave to admit the affidavits ultimately depends on the facts in a particular case, we do note other relevant considerations. The dispute arises in the context of a motion for summary judgment. In adjudicating such motions, the burden of proof is on the movant, and courts should grant wide latitude towards the evidence presented by the party opposing the motion, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Articles of Device*, 527 F.2d 1008 (6th Cir.1976); *Bonney v. Upjohn Co.*, 487 F.Supp. 486 (W.D. Mich.1980). This rule is premised on the bias in favor of a full litigation of factual disputes; if there is a colorable, relevant dispute of fact, the parties should be given an opportunity to present their full proofs to the trier of fact rather than have the case be disposed of by summary proceedings. *Smith v. Hudson*, 600 F.2d 60 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979); *see* 10 Wright, Miller & Kane, *Federal Practice & Procedure* § 2712 (1983). While this principle is ordinarily invoked when the issue is whether there are any disputed facts which preclude the movant's right to relief, it is also applicable when determining whether there exists excusable neglect in not timely bringing those facts before the court. In other words, when the court examines the conduct of the party failing to timely file affidavits and the consequences thereof, it

should err on the side of that party in deciding if excusable neglect has been shown. Nonetheless, even when we review the facts from this perspective, we do not find the defendant's failure excusable.

We have before us a situation wherein the counsel for the defendant was in possession of obviously material affidavits for almost two months. The CCC represented to the Court that those affidavits have the effect of throwing the credibility of the trustee's primary affiant, Earl Roggenbuck, into doubt; simply put, the government contends that Roggenbuck is lying. Nevertheless, the government neither submitted these documents to the Court nor provided copies to opposing counsel. Although the government states that it informed the plaintiff that it did not believe Roggenbuck's version of the facts, that representation, without more, is a far cry from making the trustee aware that there was evidence which could adversely affect his claim. During this period the plaintiff and his counsel were actively involved in settlement negotiations, they twice had to prepare to argue the various motions, and briefs were filed. At the very least, the government's failure to produce the affidavits inconvenienced the plaintiff; at worst, that failure materially and adversely affected his ability to conduct the litigation.

For that matter, the Court was similarly inconvenienced. Like the parties, we prepared for the hearing as, presumably, we are supposed to do: by thoroughly reviewing the motions, briefs and exhibits pertinent to the motion, we were able to commence the hearing with a comprehension of the major issues in contention, an anticipation of the arguments to be made, and a tentative, if unannounced, finding. All that preparation effectively went for naught when the CCC came into the courtroom and proposed to submit new material. We believe that this is the type of evil the rules were adopted to avoid; by offering the affidavits in an untimely fashion, the CCC frustrated the prompt adjudication of this matter. Therefore, the government's

error should not be held to be "excusable neglect".

The government further contends that whatever prejudice was caused by its failure to timely file the affidavits has been resolved because the Court took the matter under advisement. Since the plaintiff has now had an opportunity to review the affidavits, the harm in admitting them has been alleviated. This argument fails because it proves too much. If this were all that were necessary to cure the ills that Rules 6(d) and 56(c) were meant to avoid, then the government scored a *de facto* victory when the matter was adjourned for the sole purpose of giving more thorough thought to the problem. The Court did not intend to grant the government's motion by indecisive action. Analytically, we approach the question of admissibility as if it were being decided at the hearing. The Court could have "shot from the hip" at that time, and the decision not to do so does not alter the substantive rights of the parties.

■ Moreover, we note that the Court could have adjudicated the matter without any hearing whatsoever. There is no requirement in Rule 56 that a hearing be conducted on a motion for summary judgment. *Allied Chemical Corp. v. Mackay*, 695 F.2d 854 (5th Cir.1983). The Local Rules of the District Court for the Eastern District of Michigan, which apply to this Court, address when hearings shall be permitted. Local Rule 17(j) states that on most motions, including those for summary judgment, a hearing shall be permitted, unless the judge orders otherwise. However, the rule goes on to state an important exception: in cases before courts sitting in Bay City,[5] Flint or Port Huron, *"no oral hearings in those cities will be held on any motions unless ordered by the Court."* (Emphasis added). In other words, there need be no hearing on a summary judgment motion filed in this Court, and it may be decided solely on the basis of whatever briefs, pleadings, affidavits and exhibits are properly submitted by the par-

---

**5.** The Northern Division, where this Court sits, is in Bay City.

ties. Had we followed that practice here, the CCC would have lost; as we indicated above, and will outline more fully below, without the government's affidavits the plaintiff has made out a case entitling it to summary judgment.

Attorneys are charged with a knowledge of the Federal Rules of Civil Procedure and the local rules of court which govern any particular proceeding. These rules, including the requirement relied upon by the plaintiff, are not a so-called "trap for the unwary" which may be sprung on an unwitting party to defeat his or her claim for arbitrary or unnecessary reasons. Instead, the rules were established to facilitate the orderly adjudication of disputes. The matter now before the Court is, in fact, a perfect example of the need for the rule. The last-minute submission of the affidavits has caused needless inconvenience to the plaintiff, the CCC's co-defendant, and the Court. The resultant confusion has delayed resolution of this matter. If the inability of competent counsel to know and abide by the rules constitutes excusable neglect, then there is in fact no purpose for the rule; nearly any failure, short of a conscious, willful failure to obey the rules for tactical purposes, would become excusable. We do not find that potential result palatable. Accordingly, we hold that counsel's failure to comply with F.R.Civ.P. 6(d) and 56(c) (and their counterparts, Bankruptcy Rule 9006(d) and 7056(c)) because he was unaware of them does not constitute excusable neglect such as to warrant admission of the affidavits. *Cf. Driver v. Gindy Mfg. Corp.*, 24 F.R.D. 473 (E.D.Pa.1959). Accordingly, the CCC's affidavits are excluded.

### III. FINDINGS OF FACT

Having so held, we review the plaintiff's motion for summary judgment on the basis of that motion, the exhibits and affidavits properly attached thereto; but without regard to the affidavits offered by the CCC.[6] We find the following facts:

6. We also note that we do not consider the additional exhibits submitted by the plaintiff on June 10, 1985, five days after the hearing.

1. In December, 1981, Earl Roggenbuck approached the Commodity Credit Corporation for the purpose of seeking a loan to Earl Roggenbuck Farms, Inc.

2. At that time, officers of the CCC advised Roggenbuck that it would not loan money to the corporate debtor, but would loan money to Mr. Roggenbuck personally.

3. At that time, Roggenbuck advised the CCC that the corn which they requested be pledged as collateral for the loan belonged to the corporation and not to him personally.

4. On or about December 16, 1981 Roggenbuck personally executed a Farm Storage Note in the amount of $232,790.36 to the CCC, and on February 26, 1982 he executed a Farm Storage Grain Reserve Agreement.

5. As collateral for the sums advanced, Roggenbuck granted the CCC a security interest in 92,012 bushels of corn which were owned by the debtor.

6. Roggenbuck had no authority to pledge the corporation's corn as security for his own personal loan.

7. The CCC filed a financing statement with the Huron County Register of Deeds identifying the debtor as Earl Roggenbuck rather than Earl Roggenbuck Farms, Inc.

8. First National Bank of Bad Axe, which held a security interest in, among other things, debtor's stored corn, released that lien in favor of the CCC.

9. The debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 7, 1982.

10. After the Chapter 11 was filed and Roggenbuck failed to repay his loan or surrender the corn, the CCC took possession of the corn and eventually sold it. The proceeds from that sale totalled $259,288.52.

11. There was no court order authorizing these acts.

Those exhibits are no more timely than the government's.

12. On September 6, 1983, subsequent to the debtor's petition for relief under Chapter 11 of the Bankruptcy Code, but before the Chapter 11 trustee was appointed or the case converted to Chapter 7, the debtor in possession demanded that the CCC turn over the proceeds from the corn. The CCC refused. The CCC also later refused a similar request from the trustee.

13. In December, 1981, the debtor also owned 14,000 bushels of high moisture corn.

14. In December, 1981, the CCC loaned Earl Roggenbuck, individually, an amount of money equal then to the value of 9,800 bushels of high moisture corn. As security for that loan, the CCC took a security interest in the 14,000 bushels of corn that was the property of the debtor, which Roggenbuck again had no authority to pledge as collateral.

15. In 1983, with the CCC's assent, Earl Roggenbuck used personal funds to buy 9,800 bushels of dry corn, and the CCC took a replacement lien on this corn. Roggenbuck used his personal funds because the debtor was involved in a dispute over cash collateral at that time. When the debtor was given authority to use cash collateral, the debtor reimbursed Roggenbuck for his purchase of the dry corn. The CCC released its lien on the high moisture corn, and the debtor ultimately sold that corn.

16. In May, 1984 the dry corn held by the CCC was sold and proceeds of $31,939.49 were realized. This sum was deposited in an interest-bearing account pending resolution of the instant dispute.

## IV. CONCLUSIONS OF LAW

■ Based on these findings of fact, certain conclusions of law can be drawn. Count I of the trustee's complaint alleges that the CCC unlawfully converted the debtor's corn. Conversion has been defined as "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with, his rights therein." 22 M.L.P., *Trover and Conversion*, § 1 (West, 1958); *Thoma v. Tracy Motor Sales, Inc.*, 360 Mich. 434, 104

N.W.2d 360 (1960); *Nelson & Witt v. Texas Co.*, 256 Mich. 65, 239 N.W. 289 (1931); *Gum v. Fitzgerald*, 80 Mich.App. 234, 262 N.W.2d 924 (1977). When the facts are examined in light of these elements, it is plain that the plaintiff has made out a case for conversion. The corn (and the proceeds thereof) was property of the debtor, which the CCC obtained without the authorized consent of the debtor. The CCC ultimately sold the corn. When the debtor in possession made demand for turnover of the proceeds in September, 1983, and when the trustee renewed that demand, the defendant refused to either turn over those proceeds or replace the corn. Whether or not the defendant acted under a good faith belief that it had a superior interest in the corn is immaterial. *Trail Clinic, P.C. v. Bloch*, 114 Mich.App. 700, 319 N.W.2d 638 (1982); *Willis v. Ed Hudson Towing, Inc.*, 109 Mich.App. 344, 311 N.W.2d 776 (1981). Therefore, summary judgment is granted to the plaintiff as to his claim of conversion.

■ Count II asserts that the CCC's receipt and sale of the corn was a post-petition transfer of property of the estate, which the trustee may recover under § 549(a) of the Bankruptcy Code. We agree with the trustee. The instant transfers occurred in 1983, well after the filing of the petition. The trustee stated in his affidavit that there was no order authorizing the transfer or sale of the corn. Our own search reaches the same result. Whether we rely on the trustee's affidavit, or simply take judicial notice of the files, *Harrington v. Board of Education*, 649 F.2d 434 (6th Cir.1981); *In re Leach*, 35 B.R. 100, 9 C.B.C.2d 1090 (Bankr.W.D.Ky. 1983), the trustee has established the elements of an avoidable post-petition transfer.

■ The trustee's third claim is that the taking and selling of the corn constitute fraudulent transfers as defined in 11 U.S.C. § 548(a). That section states that the trustee may avoid transfers of property of the debtor made "on or within one year before the date of the filing of the petition."

Thus, § 548 by its own terms does not apply to the case at bar. The transfers may be pre-petition or post-petition, but not both. Since we find that post-petition transfers occurred, we hold that the trustee has not stated a claim under § 548, and summary judgment on this count is denied.

■ Similarly, we deny summary judgment on Count IV of the complaint. Essentially, the trustee argues that, to the extent the CCC claims a security interest in the corn, it is unperfected and therefore avoidable by the trustee by virtue of § 544(a). We find this provision to be inapplicable to the case at bar. The loan, security agreement and financing statement listed the debtor as "Earl Roggenbuck" rather than "Earl Roggenbuck Farms, Inc.". Also, so far as the record indicates, either the CCC entered into the transaction with the belief that Roggenbuck, not the debtor, was the party that owned the corn, or if it believed the debtor owned the corn, it simply failed to obtain a security agreement signed by the debtor pledging that corn. Thus, there is no evidence in the record that the CCC intended to obtain a security interest in the debtor's property or that the debtor actually conveyed such an interest to the CCC. A security interest does not attach to collateral and become enforceable unless:

(a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned; and
(b) Value has been given; and
(c) The debtor has rights in the collateral.

Mich.Comp.Laws § 440.9203(1); Mich.Stat. Ann. § 19.9203(1). If the security agreement is executed by a person who has not been authorized to do so on behalf of the debtor, the security interest is invalid and the creditor has no rights in the collateral. *Rohe Scientific Corp. v. National Bank of Detroit*, 133 Mich.App. 462, 350 N.W.2d 280 (1984). That is what occurred here. As we find that no security interest in the

corn was ever obtained by the CCC, perfection is immaterial, and there is nothing to be avoided.

## V. GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

■ We next address the government's motion for partial summary judgment, and deny it simply as a matter of pleading. The motion requests a determination of whether the government's argument that "the trustee is bound by defenses which could have been asserted against the debtor" has merit. As noted *infra*, an affirmative answer to this proposition is one of the cornerstones of the CCC's attempt to establish a constructive trust. Unfortunately, the motion itself does not state grounds upon which summary judgment could be granted. It makes no allegation of fact, stating only that "the issue is one of law and may be resolved on the basis of the facts stipulated to in the Joint Pre-trial Statement." That is not correct; a central issue to the establishment of a constructive trust is whether Roggenbuck acted fraudulently, and that has hardly been stipulated to. No affidavits or exhibits accompany the motion. It is really little more than a request for an advisory opinion and, without a factual context upon which to rely, we can say only "maybe yes, maybe no". Even were the government's affidavits admitted, an affirmative answer on the government's motion would be denied for the same reasons. Accordingly, the CCC's motion for partial summary judgment is denied.

## VI. TRUSTEE'S MOTION TO DISMISS

The trustee attacks the CCC's "third-party complaint" on various procedural grounds. First, it contends that the complaint was untimely pursuant to the Court's scheduling order of September 5, 1984, which arose out of the pre-trial conference held on August 30. That order established September 13, 1984 as the last date for amendments to pleadings filed in the case. On September 12, 1984, the trustee filed an amended complaint against the CCC and Earl Roggenbuck. On March 29,

1985, pursuant to further leave, the plaintiff filed a second amended complaint against the CCC and Earl Roggenbuck. On April 11, 1985, the CCC filed its answer and, as a part thereof, it added a "third-party" claim against Earl Roggenbuck Farms, Inc. alleging that a breach of a loan agreement between the parties and fraudulent misrepresentations made by the cross-defendant Roggenbuck in connection therewith entitles it to a declaration of constructive trust on the estate's assets.

In support of its argument, the trustee cites F.R.Civ.P. 14(a), which, in pertinent part states:

At any time after commencement of the action a defending party, as a third-party plaintiff may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him. *The third-party plaintiff need not obtain leave to make the service if he files a third-party complaint not later than 10 days after he serves his original answer.*

(Emphasis added). In particular, the trustee focuses our attention on the requirement that leave to file a third-party complaint is required if filed more than ten days after service of the "original answer". He takes this to mean the date of the CCC's first answer to the original complaint; if so, then the CCC would be obliged to request leave of this Court before filing its claim against the debtor.

If the CCC's claim were a third-party claim, we would have to decide whether "original answer" could, or should, be deemed to refer specifically to the first answer filed by a party. However, we need not reach that issue here, because the CCC's complaint against the debtor is not a true third-party claim. Although the CCC designated this cause of action against the debtor as a "third-party complaint", it is in fact a counterclaim. The trustee is the representative of the estate, and can either sue or be sued in that capacity, 11 U.S.C. § 323. Even though the CCC brought the action against a third party in theory, that party really has no standing here other than through the trustee. It is thus more in the nature of a counterclaim rather than a third-party claim, and notwithstanding the characterizations by the parties, we will give substance priority over form, and analyze the claim for a constructive trust as if it were properly designated. F.R.Civ.P. 8; Bankruptcy Rule 7008.

Procedures regarding counterclaims are governed by F.R.Civ.P. 13. Ordinarily, we would consider the CCC's counterclaim to be compulsory; as the discussion, *infra,* makes clear, the government's claim is unquestionably one that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." However, an extra wrinkle is added by Bankruptcy Rule 7013; it adopts Rule 13, but with the additional proviso that "a party sued by a trustee or debtor in possession need not state as a counterclaim any claim which he has against the debtor, his property, or the estate, unless the claim arose after the entry of an order for relief." In effect, this section transforms a pre-petition, compulsory counterclaim into a permissive counterclaim. For purposes of analyzing the propriety of adjudicating the counterclaim, then, we would utilize the standards established under Rule 13(b) rather than 13(a). We note first that, in contrast to Rule 14(a), Rule 13(b) contains no requirement that a party obtain leave of court to file that counterclaim. *See* 6 Wright & Miller, *Federal Practice and Procedure* § 1420, 114 (1971). Similarly, there is no language regarding "original answers". The CCC's counterclaim or affirmative defense was timely filed in response to an amended complaint, F.R.Civ.P. 15(a), Bankruptcy Rule 7015, and both pleadings are deemed to relate back to the time of the original pleading, Rule 15(c). Thus, the counterclaim cannot be disposed of for untimeliness under the Federal Rules of Civil Procedure.

 Instead, whether to adjudicate the counterclaim concurrently with the case in chief should be determined by examining

the effect the litigation would have on the primary case. Under Rule 13(i), if trying both actions at the same time would unduly complicate the litigation, or cause unnecessary delay, the court may order separate trials to ensure an expedient resolution of the plaintiff's case. *Id.,* at 115. There is no need to resort to that here. As will be explained in detail, *infra,* the primary issue raised in the counterclaim—that is, the purported fraud by Roggenbuck—is inextricably intertwined with the litigation of the trustee's complaint; indeed in our discussion of the complaint, we treat the counterclaim as an affirmative defense. In short, there is a sufficient identity of issues between the complaint and counterclaim to make dismissal inappropriate.

 The trustee also claims that the counterclaim is untimely filed because the last date for filing claims against the estate was October 10, 1984, and the counterclaim was not filed with the Court until April 15, 1985. In support of this contention, the trustee cites Bankruptcy Rule 3002(c), which states that proofs of claim in a Chapter 7 case shall be filed within 90 days after the first date set for the meeting of creditors. The trustee, however, neglects to consider the exceptions to the above standard. Rule 3002(c)(3) states that when an unsecured claim arises in favor of a person pursuant to a judgment, that person has an extra 30 days after the entry of judgment in which to file a claim. That this provision anticipates the situation where litigation over a secured claim is not resolved until after the claims date has passed is succintly stated by the Advisory Committee Note:

> Although the claim of a secured creditor may have arisen before the petition, a judgment avoiding the security interest may not have been entered until after the time for filing claims has expired. Under Rule 3002(c)(3) the creditor who did not file a secured claim may nevertheless file an unsecured claim within the time prescribed. A judgment does not become final for the purpose of starting the 30 day period provided for by paragraph (3) until the time for appeal has

expired or, if an appeal is taken, until the appeal has been disposed of.

(Citation omitted). Since the CCC would be able to file a proof of claim 30 days after the entry of a determinative adverse judgment against it, it could certainly file a claim against the estate before that date. The counterclaim cannot be attacked as being untimely under Rule 3002. *Cf.,* 11 U.S.C. § 502(h).

 The trustee's last procedural argument for dismissal is that the counterclaim fails to plead fraud with particularity, as required by F.R.Civ.P. 9(b), as incorporated by Bankruptcy Rule 7009. Since the CCC alleges no fraud on the part of the debtor (i.e. the corporation) the trustee contends that the counterclaim ought to be dismissed for failure to state a cause of action pursuant to Rule 12(b)(6). A ruling on that basis would be inappropriate here; as noted above, the CCC's counterclaim, liberally construed, raises a theoretically meritorious affirmative defense to the trustee's complaint. This does not, however, preclude us from determining the matter via other procedural devices. F.R.Civ.P. 12(b). Rule 12(b) (incorporated into the Bankruptcy Rules by Rule 7012(b)) provides that if matters outside the pleadings are "presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56". In the instant proceedings, it would be folly not to consider the admissible evidence submitted in determining whether the counterclaim can stand. The motion for summary judgment and the motion to dismiss were incorporated into one pleading, they refer to the same exhibits and affidavits, and they are governed by the same arguments of law.

Therefore, we deem the trustee's motion to dismiss to be one for summary judgment on the CCC's counterclaim. As our decision to grant summary judgment on the trustee's complaint required us to address all of the material elements of the counterclaim, the decision on the instant matter is a foregone conclusion: we grant summary judgment to the plaintiff.

Finally, we address the motion of Earl Roggenbuck for dismissal of the cross-claim which the CCC also included in its answer to the plaintiff's second amended complaint.

## VII. ROGGENBUCK'S MOTION TO DISMISS

■ Earl Roggenbuck, individually, moved to dismiss the CCC's cross-claim against him on the ground of lack of sub- ject matter jurisdiction. First, he properly noted that even the CCC did not allege its cross-claim to be a core proceeding, 28 U.S.C. § 157(b), since its short and plain statement of the grounds for jurisdiction alleged it to be 28 U.S.C. § 157(c). That section gives the bankruptcy judge jurisdiction to hear but not decide "a proceeding that is not a core proceeding but that is otherwise related to a case under title 11." Roggenbuck argues that both the CCC and he are non-debtors, and that the outcome of their dispute will have no impact upon the administration of the bankruptcy estate, hence, the cross-claim falls outside the scope of this Court's jurisdiction over a proceeding "related to a case under title 11". Since we reject one of the premises of this argument, we likewise reject its conclusion.

Roggenbuck's assertion that this is a "dispute ... which does not have any effect or impact upon the administration of this bankruptcy estate" begs the question. If summary judgment had not been granted, this case would have proceeded to trial of the principal factual question in this entire proceeding—whether Roggenbuck made false representations to the CCC which caused it to make a sizable loan to him. If he did, then he might be individually liable to the CCC for the tort of misrepresentation. At the same time, and as a consequence of this very same factual determination, the CCC might have been entitled to trace the proceeds of that loan into the debtor's bankruptcy estate and successfully assert a constructive trust on those proceeds. Such a finding would result in a

substantial diminution of the estate. On the other hand, a finding that no misrepresentation occurred would result in a judgment in the principal action adverse to the CCC; however, it would still be possible that the CCC would succeed against Roggenbuck individually, this time on a straight contract theory. Alternatively, it is possible that Roggenbuck's theory that he told the CCC that it was the corporation and not he that was borrowing the money would be accepted as true, in which case, the CCC may not have any claim against him, but instead have an unsecured[7] claim against the estate. Thus, the principal factual issue in this case could have had a material and substantial effect upon the administration of the bankruptcy case. Were we to try this set of operative facts here, it would be a waste of judicial assets to have the matter retried in a separate tribunal. Thus, if summary judgment were not granted we would have deemed it advisable to retain jurisdiction.

■ Roggenbuck also argued that if the Court did not dismiss the case it would be exercising ancillary jurisdiction, a power that district courts, but not bankruptcy courts, possess. No support for or against this proposition was offered. We believe, however, that for two reasons, this argument is unsound. Assuming for the moment that ancillary jurisdiction is involved, the district court for the Eastern District of Michigan referred all of its jurisdiction but for that which it explicitly withheld and that which it may not constitutionally delegate, to the bankruptcy court in its July 23, 1984 order of reference (Administrative Order # 84X00084). Since the district court has not expressly withheld ancillary federal jurisdiction from the bankruptcy court, the only reason we might not exercise such jurisdiction must be of constitutional dimension. Ancillary jurisdiction has been described as follows:

> When a federal court has jurisdiction over the main cause of action, it also has jurisdiction over any proceeding ancillary

7. The claim is unsecured because of the CCC's failure to file a financing statement signed by an authorized representative of the corporate

debtor. 11 U.S.C. § 544(a); Mich.Comp.Laws § 440.9203; Mich.Stat.Ann. § 19.9203.

to that action, regardless of the amount of money involved, the citizenship of the parties, or the existence of a federal question in the ancillary suit. By virtue of this principle, the district court exercises jurisdiction over many proceedings as ancillary, even though there would be no federal jurisdiction if these proceedings were originally and independently litigated. Thus, where jurisdiction of the main cases supports jurisdiction over the ancillary claim, it is immaterial that the amount in controversy in relation to the ancillary claim or proceeding is less than the jurisdictional amount which would be required for independent jurisdiction over the ancillary claim or proceeding....

Similarly, a *federal court sitting in bankruptcy has ancillary jurisdiction* to protect and effectuate its jurisdiction by enjoining, when appropriate, the prosecution of suits against the debtor in other forums, regardless of the amount involved and even after termination of receivership proceedings in a federal court, the court may exercise ancillary jurisdiction to protect its judgment by enjoining relitigation of the issues by the parties in another suit, notwithstanding the amount in controversy.

1 *Moore's Federal Practice* ¶ 0.90[3], p. 828.1–830 (2d ed.1948) (emphasis added).

In our opinion, 28 U.S.C. § 157(c) is, in effect, a statutory grant of ancillary jurisdiction. In *White Motor Corp. v. Citibank, NA*, 704 F.2d 254 (6th Cir.1983), the Sixth Circuit Court of Appeals determined that *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) did not invalidate the entire grant of jurisdiction formerly contained in 28 U.S.C. § 1471. It read the *Marathon* opinion to hold unconstitutional only 28 U.S.C. § 1471(c), "the section purporting to vest direct and nonderivative jurisdiction in the bankruptcy courts." *In re Davis*, 730 F.2d 176, 182 (5th Cir.1984). The limit of bankruptcy court authority under former 28 U.S.C. § 1471(b), now §§ 1334(b) and 157(c)

is that the controversy must have "some reasonable nexus between a particular civil proceeding and the title 11 case". 1 *Collier on Bankruptcy*, ¶ 3.01, 3–46 (15th ed. 1982); *compare Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir.1984); *United Coal Co. v. Hoyer*, 29 B.R. 1019, 10 B.C.D. 1243 (Bankr.W.D.Va.1983); *In re Haug*, 19 B.R. 223, 9 B.C.D. 61, 6 C.B.C.2d 479 (Bankr.D. Ore.1982), which found an insufficient nexus, *with In re Davis, supra; In re General Oil Distributors, Inc.*, 21 B.R. 888, 9 B.C.D. 392 (Bankr.E.D.N.Y.1982), which found a sufficient nexus. As stated earlier, we find a sufficient nexus between the principal bankruptcy case and the cross-claim in question. Therefore, since the grant of jurisdiction to the bankruptcy court under former 28 U.S.C. § 1471(b), now 28 U.S.C. § 1334(b) in conjunction with 28 U.S.C. § 157(c), is constitutional when applied to a case with a reasonable nexus to the title 11 case, and since we find this to be such a case, bankruptcy court jurisdiction of this cross-claim is constitutional. This would be so even were there no independent grounds for federal jurisdiction as to the cross-claim.

As noted above, ancillary jurisdiction is used when there is no independent grounds for exercising federal jurisdiction in the non-principal action. We note here, however, that in this case the CCC is a corporate agency of the federal government. 15 U.S.C. § 714; *Buckeye Sugars, Inc. v. Commodity Credit Corp.*, 744 F.2d 1240 (6th Cir.1984). The district courts of the United States have "exclusive original jurisdiction, without regard to the amount in controversy, of all suits brought by or against the Corporation [CCC] ..." 15 U.S.C. § 714(b). Thus the federal district court for this district clearly has subject matter jurisdiction over the cross-claim. As stated earlier, the mere delegation of that authority to the bankruptcy court pursuant to 28 U.S.C. § 157(c) is proper, and therefore, the motion to dismiss for lack of subject matter jurisdiction would have been denied had summary judgment not been granted to the plaintiff.[8]

**8.** The plaintiff was also granted a summary judgment as to the other defendant, Earl Rog-

genbuck, on the question of liability only, on March 8, 1985.

While we reject Roggenbuck's arguments in support of his motion to dismiss, he emerges victorious because we decide to dismiss the cross-claim anyway. We are disposing of the trustee's complaint and the CCC's countercomplaint by granting summary judgment. Once that is done, there is little reason for us to retain jurisdiction over a lawsuit between two parties, neither of whom are in bankruptcy. Although, as stated above, we believe that the bankruptcy court has subject matter jurisdiction over the cross-claim, we decide that it is unnecessary to exercise that jurisdiction here, and we decline to do so. Accordingly, the cross-claim will be dismissed.

## VIII. CONCLUSION

Briefly summarizing the net results of the foregoing opinion, we deny the motion of the CCC to have the affidavits offered at the hearing admitted into evidence. Reviewing the evidence in light of that ruling, we grant partial summary judgment to the trustee on Counts I and II of the second amended complaint, but deny summary judgment on Counts III and IV. We deny the CCC's motion for partial summary judgment. The CCC's "third-party" complaint is deemed to be a counterclaim; we do not grant the trustee's motion to dismiss, but grant summary judgment to the trustee on that claim. Finally, we grant Roggenbuck's motion to dismiss.

An order consistent with this opinion shall be entered contemporaneously herewith.