486 So.2d 129 (1986)
PLAQUEMINES PARISH COMMISSION COUNCIL
v.
DELTA DEVELOPMENT COMPANY, INC., et al.
No. CA-4242.
Court of Appeal of Louisiana, Fourth Circuit.
March 12, 1986.
Rehearing Denied April 16, 1986.
*130 Jack Pierce Brook, George W. Hardy, III, John R. Schupp, Randall A. Karr, Broadhurst, Brook, Mangham & Hardy, New Orleans, Ernest R. Eldred, George L. Clauer, S. Dwayne Broussard, David M. Latham, Eldred, Clauer & Davis, Baton Rouge, for Plaquemines Parish Com'n Council.
Daniel Lund, Harold B. Carter, Jr., Francis P. Accardo, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, for defendant-appellee, Delta Development Co., Inc.
Peter J. Butler, Aubrey Hirsch, Butler, Heebe & Hirsch, New Orleans, for defendants-appellees, Leander H. Perez, Jr., and Aphra Perez.
J. Minos Simon, J. Minos Simon, Ltd., Lafayette, for defendants-appellees, Chalin O. Perez and Lynn Perkins Perez; Donald W. Doyle, A.N. Yiannopoulos, of counsel.
Gene W. Lafitte, William R. Pitts, Anne E. Tate, Liskow & Lewis, New Orleans, for defendants-appellees, Betty Perez Carrere and Richard J. Carrere.
John M. McCollam, Marcel Garsaud, Jr., Andrew McCollam, III, Gordon, Arata, McCollam & Stuart, New Orleans, for defendants-appellees, Joyce Perez Gelpi, Chester P. Gelpi, Thomas Perez Eustis, Flora Ann Eustis, Geoffrey Edward Eustis, Nancy Kerr Eustis and Margaret Miller Eustis.
Before BYRNES, CIACCIO and WILLIAMS, JJ.
WILLIAMS, Judge.
The Plaquemines Parish Commission Council ("PPCC")[1], successor in interest and title to the Grand Prairie Levee District ("GPLD") and Buras Levee District ("BLD"), appeals an adverse judgment dismissing, on a peremptory exception of prescription, its petition to recover certain overriding mineral interests affecting its lands acquired by Delta Development, Inc. ("Delta")[2], and the heirs and successors in *131 title of Leander H. Perez, Sr. and his wife, Agnes O. Perez, both now deceased.[3]
Based on allegations set forth in its petition, PPCC seeks "a declaration that it is the legal and rightful owner of the mineral interests, delivery of title of those interests from the defendants to PPCC, and an accounting and money judgment for all monies received by defendants attributable to those interests."
PPCC instituted this action on August 25, 1983. PPCC alleges that Leander Perez, Sr. acquired overriding mineral royalties in leases granted by the GPLD and BLD to Delta, a family owned and controlled corporation, in 1936 and 1938, respectively, while he was the Plaquemines Parish District Attorney and ex-officio attorney for the levee boards. It is alleged that Perez concealed his mineral interests in the leases through the use of interposed parties, unrecorded documents and counterletters and that he continued to conceal his mineral interests and ownership of Delta while serving as a member of the PPCC constituting fraud, conflict of interest and a violation of his fiduciary duty as an attorney and public official of the parish.
PPCC further alleges that Leander Perez, Jr. and Chalin Perez breached their fiduciary duties as public officials by concealing the fact of their acquisitions of a portion of the overriding interests and in failing to take the necessary action for the return to Plaquemines Parish of the overriding royalty interests originally acquired by their father.[4]
The Trial Judge, G. William Swift, Jr., rendered judgment in favor of all defendants holding that PPCC's suit was a personal action subject to ten years liberative prescription and that PPCC's suit was barred because liberative prescription had commenced to run in 1941. Judge Swift rejected PPCC's argument that due to acts of concealment by Perez and his heirs, PPCC was ignorant of their cause of action and the doctrine of contra non valentem agere nulla curret praescriptio (prescription does not run against one unable to act) interrupted the running of prescription until the filing of the suit. Judge Swift determined that the levee boards had notice of Perez's activities as early as 1941, relying principally upon a resolution passed by the GPLD and BLD in 1941 seeking to employ "special attorneys" to investigate their financial affairs, to review all transactions with respect to the land and leases under their administration and to initiate any legal proceedings found necessary to protect their rights. It is from this judgment PPCC brings forth this appeal.
FACTS
The overriding mineral royalty interests Perez allegedly acquired are derived from three leases (base lease[s]) granted by the GPLD and BLD to Delta in 1936 and 1938, respectively. At the time these base leases were granted to Delta, Perez was the district attorney for the 29th Judicial District, then comprising the Parishes of Plaquemines and St. Bernard. As district attorney, Perez was the ex-officio attorney and legal counsel for all levee districts within the 29th Judicial District (later organized as the 25th Judicial District), including the GPLD and BLD. In 1961 Perez became a member of the PPCC and served as its president until 1967.
On July 20, 1936, GPLD granted a mineral lease to Delta affecting all of the land within its district which was properly recorded in the Conveyance Records of Plaquemines Parish.[5] Shortly thereafter, *132 on August 24, 1936, Perez and Delta executed an agreement retaining Perez as counsel to negotiate subleases of the GPLD lease. As compensation for Perez's services, the agreement provided for cash bonuses and an interest in any overriding mineral royalties acquired by Perez on behalf of Delta in excess of one forty-eighth. It appears that Perez never informed the GPLD of his connection with Delta, or of his role as an attorney representing Delta in the negotiation of the GPLD sub-lease.[6]
The GPLD lease was sub-leased by Delta to Gulf Refining Company of Louisiana ("Gulf") on April 8, 1937. The terms of the sub-lease, among other things, provided for the retention of a one forty-eighth overriding mineral royalty in favor of Delta for all oil and gas produced by Gulf under the lease. A letter, introduced into the record by PPCC, shows that Gulf also prepared an additional assignment of an overriding royalty on its lease interest in favor of Perez, but later changed it to substitute Albert S. Cain, Jr., an associate practicing law with Perez, as assignee. The overriding royalty agreement in favor of Cain, executed on April 9, 1937, provided for a one forty-eighth royalty. On May 27, 1937, Cain assigned the one forty-eighth overriding royalty to Delta. On the same day, a counterletter was confected by Delta and Perez wherein Perez's ownership of the one forty-eighth was acknowledged, stating that it was in Delta's name for his convenience.
On June 11, 1938, the BLD granted Delta two mineral leases affecting lands within their district. Perez executed a similar agreement with Delta as in the GPLD lease whereby he undertook to represent the company in the negotiation of the BLD sub-leases. His compensation by Delta for legal services mirrored that in the GPLD leases.
Perez negotiated a sub-lease of the GPLD leases from Delta to Gulf on December 17, 1938, retaining a one forty-eighth overriding royalty for Delta out of Gulf's interest. Utilizing a similar series of transactions as in GPLD sub-leases, Perez acquired an additional one forty-eighth overriding royalty in conveyances from Gulf to Cain then Delta with Perez's ownership concealed by the issuance of a counter-letter from Delta.
Perez's ownership in the mineral interests became subject to an inquiry by the GPLD and BLD in 1941, eventually leading to accusations of breaches of fiduciary duty, fraud and conflict of interest, augmented by a resolution adopted by both levee boards setting forth the above facts. (Full text of the resolution is provided below.) In its resolution the levee boards sought to employ Thomas E. Furlow and William J. Blass as "special attorneys" to supercede Perez in his role as ex-officio attorney of the levee boards in an investigation of his financial affairs with respect to the base leases. For reasons to be discussed more fully below, the levee boards' efforts failed to yield results.
In the same year that the boards of GPLD and BLD adopted the resolution, Delta-Louisiana was reincorporated as a Delaware corporation. Although the public records do not reveal the ownership of Delta's stock, it was stipulated at the trial that at the time of the reorganization, the 495 shares of Delta stock were owned entirely by Mrs. Perez. Pursuant to the reincorporation, 495 of the newly issued 511 outstanding shares were issued to R.J. Chauvin. On the same day as the reissuance, *133 Chauvin assigned these 495 shares to Mrs. Perez. In 1944, Mrs. Perez, in acts joined in by Mr. Perez, made an inter vivos donation of this stock to their four children.
Though there were numerous events subsequent to the 1941 Board resolution relied upon by the defendants to establish notice for the purpose of prescriptionvarious books, magazines and newspaper articles, a 1961 compromise by Plaquemines Parish with the oil company lessees and a reference to the overriding royalties in the Succession of John Douglas Eustis[7] we agree with Judge Swift that the 1941 resolution is the pivotal fact in determining the applicability of contra non valentem. It is conceded that none of the Perez family's ownership of Delta stock or the acquisition of the one forty-eighth overriding mineral interests by Perez and the subsequent donations have been recorded in the public records of Plaquemines Parish. Furthermore, the first publicly recorded reference to the mineral interests is an assignment of a mineral interest executed by Mary Ellen Sheehan Perez, former wife of Chalin Perez, to Nochemo, Incorporated, filed on February 11, 1980, in the conveyance records of Plaquemines Parish.
In our consideration of whether Judge Swift was correct in sustaining the defendant's peremptory exception of prescription, we express no opinion as to the merits of the PPCC's claim that the acquisition of the disputed mineral interests or concealment by Perez or his heirs constituted a breach of fiduciary duty, fraud or both. We will, for the purposes of this opinion and the sake of brevity, assume that the manner in which Perez acquired the overriding royalties presents a cause of action.
The PPCC has briefed four specific assignments of error:
(1) The District Court should have held that Article IV, S2 of the 1921 constitution, as interpreted, makes all mineral rights owned by the State, inclusive of those here involved, inalienable and thus imprescriptible;
(2) the District Court should have classified this action as a real action not subject to any liberative prescription;
(3) the District Court erred in failing to hold that prescription of plaintiff's causes of action was tolled by application of the principle contra non valentem agere nulla currit praescriptio; and
(4) the District Court should have held that defendants are estopped from asserting liberative prescription.
Before we undertake a review of these assignments of error, one crucial assumption must be made concerning the base leases granted by the GPLD and BLD to Delta. PPCC has only asserted that the base leases were procured by fraud or deception and has neither alleged nor produced evidence tending to establish that the manner in which Delta obtained the leases renders the leases null. An action to nullify the base leases would entail wholly different considerations which are not present. Thus, for the purposes of this opinion, we shall consider the base leases valid and in full force and effect.
IMMUNITY FROM PRESCRIPTION
PPCC argues that "Article IV, Section 2 of the Louisiana Constitution of 1921, makes all mineral rights owned by the state, inclusive of those herein involved, inalienable and thus, imprescriptible," citing Dynamic Exploration, Inc. v. LeBlanc, 362 So.2d 734 (La.1978); Lewis v. State, 244 La.1039, 156 So.2d 431 (1963). Judge Swift rejected this argument as he determined that the overriding mineral royalties held by Delta and the Perez heirs, which are interests carved out of Gulf's working interests, did not qualify as a sale or alienation within the constitutional prohibition. He ruled that pursuant to Article 19, Section 16 of the 1921 Louisiana Constitution and supported by State, Through Department of Highways v. City of Pineville, 403 So.2d 49 (La.1981), and cases cited therein, the GPLD and BLD, as distinct state agencies, did not enjoy constitutional immunity *134 from the application of liberative prescription.[8]
Article 19, Section 16 of the 1921 Louisiana Constitution provided that:
[p]rescription shall not run against the State in any civil matter, unless otherwise provided in this Constitution or expressly by law.
In City of Pineville, supra, the Louisiana Supreme Court, relying upon earlier decisions in Board of Commissioners v. Earle, 169 La.565, 125 So. 619 (1929) and Board of Commissioners v. Pure Oil Company, 167 La.801, 120 So. 373 (1929), reaffirmed the principle that "levee districts could not claim immunity from liberative prescription because they (are) political corporations with a legal existence distinct from the `State'." 403 So.2d. at 51. In reaching this result, the Supreme Court stated:
.... this court has held that claims of acquisitive prescription, against mineral rights held by levee districts were barred by virtue of the constitutional prohibition against the divestiture of mineral rights in property "sold by the State," contained in Article 4, Section 2 of the 1921 Constitution, Dynamic Exploration, Inc. v. LeBlanc, 362 So.2d 734 (La.1978). It thus appears that, insofar as levee districts are concerned, the definition of the "State" depends upon what is involved: acquisitive and liberative prescription may run against a levee district, but acquisitive prescription of mineral rights may not. No decision has ever held that a levee district could be characterized as the "State" for purposes of the immunity from prescription contained in the Constitution.
* * * * * *
.... the "State," for the purposes of the constitutional immunity from prescription, does not include a state agency which is a body corporate with the power to sue and be sued and which, when vested with a cause of action, is the sole party capable of asserting it. Regardless of its status as an instrumentality of the state, such an agency remains a distinct legal entity subject to claims of prescription except where the law provides otherwise. Id. at 52.
We know of no constitutional or statutory provision that provides an exception to this holding. Accordingly, PPCC, as successor to the GPLD and BLD and a state agency within the meaning of City of Pineville, cannot claim constitutional immunity from liberative prescription.
PPCC's assertion that its cause of action to recover the defendants' overriding interests in the base leases is constitutionally imprescriptible would have merit if its suit were based on the grounds that the levee boards invalidly alienated the state's minerals in contravention of Art IV, Section 2 of the 1921 Louisiana Constitution or if the Perezs claimed ownership, contrary to Dynamic Exploration, supra, by virtue of acquisitive prescription. Neither is applicable here because the defendants have not deprived the PPCC of their rightful one-eighth royalty ownership in the base leases; their mineral interests are derived entirely from transactions involving the lessee's (Delta) and sublessee's (Gulf) share in the base leases.
The overriding mineral royalty is a passive, non-cost bearing mineral interest carved out of the lessee's working interest and is dependent upon the continued existence of the mineral lease. Fontenot v. Sun Oil Company, 257 La.642, 243 So.2d 783 (1971); Arkansas Fuel Oil Company v. Gary, 227 La.524, 79 So.2d 869 (1955); (For a more in-depth analysis, See McCollam, A Primer for the Practice of Mineral Law Under the New Mineral Code, 50 *135 Tul.L.Rev. 760-7, 828-9 (1976). Delta's mineral interests are derived from the retention of one forty-eighth overriding mineral royalty interests in its subleases to Gulf. Perez's acquisition of the additional one forty-eighth interests is derived from assignments by Gulf out of their working interests. While each transaction involves mineral interests under lease from the levee districts; neither transaction involves the levee districts' interests nor has there been a loss or alienation by the levee districts of their mineral interests under the terms of the base leases.[9] Accordingly, there is no constitutional bar to the acquisition of the overriding mineral royalties nor can PPCC claim immunity from the running of liberative prescription.
NATURE OF PPCC'S ACTION
Judge Swift determined that PPCC's cause of action was based on allegations of breaches of fiduciary duties, fraud, or both, and concluded that the entirety of their cause of action was personal, subject to ten years liberative prescription provided by La.C.C. art. 3499 (formerly art. 3544).
PPCC argues that because mineral rights may not be established by acquisitive prescription, La.Mineral Code art. 159, it is asserting a "substantive right to vindicate its ownership by obtaining a judgment recognizing its ownership and ordering delivery of the interests (overriding mineral royalties) claimed to it founded in Article 526 of the Civil Code."[10] Thus, PPCC argues, this is a mixed action under La.C.C. Pro. Art. 422, and the "fact that plaintiff (PPCC) may have sought certain additional relief (accounting) against the defendants personally does not destroy the character of the action insofar as it is a claim for recognition of ownership."[11]
PPCC's theory of present ownership is derived from the common law constructive trust doctrine, citing the Louisiana Supreme Court's decision in McClendon v. Bradford, 42 La.Ann. 160, 7 So. 78, 8 So. 256 (1890), which, in theory, lends support to the notion that property obtained by an unfaithful fiduciary inures to his principal from the moment of the fiduciary's breach of duty in acquiring the property. If this theory were supportable in the instant action, the mineral interest acquired by Perez, adversely to the principals he was representing, the GPLD and BLD, would actually be acquisitions on their behalf; therefore, certain aspects of PPCC's cause of action would be real to vindicate ownership held in trust for its benefit by the defendants.
While the constructive trust theory has appeal as a means to chastise an unfaithful fiduciary, it is an anathema to civilian notions of ownership, a precept unsupported by the Civil Code.[12] There is a pronounced lack of doctrinal support for the constructive trust theory, expressed best by Professor *136 Yiannopoulos in his Civil Law Treatise, Property, where, in a succinct analysis, it is stated:
Article 476 of the Louisiana Civil Code, as revised in 1978, is based on Article 487 of the 1870 Code but employees more precise terms. It declares: "One may have various rights in things: (1) Ownership; (2) Personal and predial servitudes; and (3) Such other real rights as the law allows." As under the prior law, ownership may be dismembered, and real rights created within limits prescribed by public policy. Article 476 does not open "the door to an unregulated brood of real rights;" parties may create only such real rights as legislation or customs allow.
As a matter of fact, all modifications of the right of ownership in Louisiana fall, with the exception perhaps of building restrictions which are sui generis real rights, within the categories of personal and predial servitudes. Joint tenures and the common law doctrine of estates are not recognized in Louisiana. Express trusts, however, are governed by the Louisiana Trusts Code which has successfully integrated useful common law institutions with the precepts of the Civil Code. Civil Law Treatise, Property, Vol. II, (1980), Section 148, pp. 391-92 (Citations and footnotes omitted.)
The constructive trust theory may have been unwittingly perpetuated in an earlier decision by this court in DecaturSt. Louis Combined Equity Properties, Incorporated Venture v. Abercrombie, 411 So.2d 677 (La.App. 4th Cir.1982); a case relied upon extensively by PPCC in support of its proposition of present ownership. DecaturSt. Louis involved a dispute between partners pertaining to immovable property that had been purchased with partnership funds and the title to the property had been placed in the names of the individual partners for their convenience. This court determined that the trial court erroneously sustained the defendants' exceptions of no cause of action and right of action because the plaintiff had written evidence tending to establish that the property, though in the partners' names individually, was in fact owned by the partnership. The case was remanded on the grounds that "(p)laintiffs should have been allowed to proceed with the proof of this cause of action including the admissibility in evidence of partnership records, cancelled checks, partnership agreements and any other competent evidence admissible for the purpose of proving this claim." Id. at 680.
DecaturSt. Louis stands for a much more limited legal proposition than that advanced by PPCC. Though there is dicta, couched in terms of a constructive trust, discussing the splitting of ownership into legal and equitable title, this aspect of the decision was not germane to the issue. DecaturSt. Louis is limited exclusively to actions involving partnerships. Furthermore, and central to the decision, there was written evidence tending to support the plaintiffs' ownership in the immovable propertya recognized mode by which ownership of immovable property is acquired in Louisiana. This court did not hold that property obtained by an unfaithful fiduciary is actually owned by the principal from the moment of the fiduciary's breach of duty in the acquisition of the property and that the principal has an imprescriptible real action to recover ownership.
The breach of a fiduciary obligation is not a mode of acquiring ownership in property. Louisiana jurisprudence is replete with cases which hold that a cause of action based on a breach of fiduciary obligation or fraud gives rise to a personal obligation subject to ten years liberative prescription provided by La.C.C. art. 3499 (former art 3544). R.E.E. DeMontluzin Company v. New Orleans and N.E.R.Co., 166 La.822, 118 So. 33 (1928); Pitre v. Peltier, 227 La.478, 79 So.2d 746 (1955); Langendorf v. Administrators of Tulane Educational Fund, 361 So.2d 905 (La.App. 4th Cir.1978), writ denied 363 So.2d 1384 *137 (La.1978).[13] These cases illustrate that the court, in a personal action, may order the conveyance of immovable property as a remedy in an action brought timely against the unfaithful fiduciary.
In R.E.E. DeMontluzin Company, the plaintiff brought an action to recover land which it had conveyed based on a breach of a resolutory condition by the defendant. In determining the nature of the plaintiff's action, the Supreme Court held that "(t)he action, although it may result in the recovery of real property, is regarded as a personal action, and is barred by the prescription, liberandi causa, of 10 years, established by article 3544 [now 3499] of the Civil Code, by which all personal actions not otherwise provided for are prescribed." Id 118 So. at 35. (Emphasis added.)
The clearest synthesis of the law as it pertains to the remedy afforded a plaintiff for a breach of a fiduciary duty or fraud is set forth in a United States Fifth Circuit opinion, Mansfield Hardwood Company v. Johnson, 268 F.2d 317 (5th Cir.1959), cert. denied 361 U.S. 885, 80 S.Ct. 156. 4 L.Ed.2d 120 (1959). In its discussion of remedies under Louisiana law, the court stated:
Louisiana courts have an awkward time imposing liability for the breach of a fiducary's duty to disclose or the breach of other fiduciary relations. In some cases involving a relationship of confidence between the parties, the Louisiana courts have used the terms of common-law equity, ordinarily obnoxious to the civil law, to describe the breach and remedy for breach of fiduciary duty, such as, "breach of trust" and "constructive trust." Normally, however, the Louisiana courts, in finding liability for a breach of a fiduciary duty, have based such liability on "fraud" as encompassed in Article 1847 of the LSA-Civil Code. This is true in cases involving both corporate fiduciaries and other fiduciaries. Therefore the breach of the relationship is called fraud and the remedy is, of course, a rescission of the contract or damages. Id. at 322-324 (Footnotes omitted.)
In our final analysis, we find the Supreme Court decision in Pitre v. Peltier, supra, to be dispositive. In Peltier, the plaintiff-heirs instituted suit against their attorney who had allegedly acquired an interest in each plaintiff's share of property through fraud or misrepresentation while representing them in a partition suit. The plaintiffs sought, among other things, to be declared owners of the property and for an accounting of revenues derived from mineral production. The trial court sustained the defendants' plea of prescription.
In considering the plaintiffs' claims, the Peltier court noted that a majority of the plaintiffs' claims were based on allegations of fraud and deceit practiced upon them by Peltier whereas two of the plaintiffs claimed that the transfers were procured through forged documents. The court determined that prescription could run in favor of the unfaithful fiduciary because the obligation is a relative nullity and concluded that "(t)he plea of prescription of ten years liberandi causa is therefore maintained as to those plaintiffs who admit their respective signatures or mark to the instruments which were allegedly procured through fraud or deception." Id. 79 So.2d at 749. The court reversed the judgment against the two plaintiffs claiming forgery as a basis of their claim for the reason that since forgery can be given no legal effect, an action to annul the instrument is imprescriptible.
Since for the purposes of this appeal, we have determined that the base leases are valid and PPCC has not argued otherwise, that portion of the Peltier opinion holding actions to rescind forged instruments imprescriptible is inapplicable to the *138 action asserted by PPCC. PPCC's cause of action is not transformed into a mixed action (the accounting is clearly personal) merely because it seeks to assert ownership of the overriding mineral royalties. Only through the recission of the transaction by which the defendants acquired their interests can the court, as a matter of remedy, recognize PPCC as the owner of the overriding royalties. Thus, PPCC is relegated to a personal action against the defendants based on breaches of fiduciary duties or fraud which, under art. 3499, and as pointed out by the Peltier court, is subject to ten years liberative prescription. Thus the final issue remains one of noticewhat date is to be applied for the purpose of determining the commencement of the prescriptive period?
CONTRA NON VALENTEM AGERE NON CURRET PRAESCRIPTIO
Since this issue is a factual determination made by the trial judge, i.e., notice for the purpose of the running of prescription, our review of the record is limited by the "manifest error" standard of review, as set out in Canter v. Koehring Company, 283 So.2d 716 (La.1973), and Arceneaux v. Dominque, 365 So.2d 1330 (La.1978). Under the authority of these cases, this court is constrained to give great weight to the trier of fact's determinations on the evidence presented and we are prohibited from substituting our own evaluations and determinations for those made by the trial court. Judge Swift has synthesized facts spanning more than fifty years into a coherent opinion properly applying the pertinent law to his factual determinations. For this reason, we adopt the entirety of his factual determinations as follows:
"Next, we must decide if and when such prescription began to run in this case, because our jurisprudence recognizes the doctrine urged by plaintiff of contra non valentem (prescription does not run against a party who is unable to act). According to our Supreme Court in Corsey v. State Department of Corrections, 375 So.2d 1319 (La.1979):
As the cited comment notes, 12 Tul.L. Rev. at 253-54, this court in Reynolds v. Batson, 11 La.Ann. 729, 730-31 (1856), authoritatively lays down the three categories of situations in which our early jurisprudence held that the principle contra non valentem applied so as to prevent the running of liberative prescription: (1) Where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; (2) Where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; and (3) Where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action.
Modern jurisprudence also recognizes a fourth type of situation where contra non valentem applies so that prescription does not run: Where the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. (This principle will not except the plaintiff's claim from the running of prescription if his ignorance is attributable to his own willfulness or neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence have learned.) Id. at 1321-22.
Both sides seem to agree with the following quotation from Cartwright v. Chrysler Corporation, 255 La.597, 232 So.2d 285 (1970):
The rule that prescription does not run against one who is ignorant of the existence of facts that would entitle him to bring suit, applies only when such ignorance is not wilful and does not result from negligence, and the doctrine has been limited to cases where the debtor has concealed the fact of the obligation or has committed other acts which tend to hinder, impede or prevent the creditor from ascertaining knowledge of the existence of the debt. See, Ayres v. New York Life Insurance Company [219 La. 945, 54 So.2d 409 (1951)] supra. Also, it is not necessary that the party have actual *139 knowledge of the conditions as long as there is "constructive notice." Whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of everything to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry is sufficient to start the running of prescription. Id. at 287 (Underscoring added.)
"The plaintiff contends that both categories (1) and (3) mentioned in Corsey are applicable in the present case. Its position is that Judge Perez and the defendants acquired the overriding royalty interests through unrecorded and undisclosed instruments and that he and his two sons concealed the facts and circumstances concerning the acquisitions and assignments thereof in such a manner that the cause or causes of action were not known by the levee districts and plaintiff until shortly before this suit was filed. In addition, plaintiff asserts that they were prevented from availing themselves of any cause of action by legal proceedings instituted by Judge Perez in the early 1940s.
"It is clear from the evidence that the public records did not reflect the ownership of the subject overrides or any clear reference thereto until the document of Mary Ellen Sheehan Perez was filed on February 11, 1980. This court is also convinced that neither Judge Perez nor the defendants ever disclosed to the levee districts or the plaintiff the facts about these interests until forced to do so through discovery in this suit.[*]
"On the other hand, the defendants offered in evidence for the purpose of showing notice numerous articles from newspapers circulated in and read by people in Plaquemines Parish in 1940 and thereafter. Magazine articles were also admitted for the same purpose. These articles generally referred in some manner to the leasing of levee districts' oil-rich lands to Delta, individuals and other companies with which Judge Perez was connected, either as an attorney or otherwise, Perez's position as legal advisor of the lessors and the growth of his personal fortune. The boards of both levee districts acknowledged in writings dated March 11 and 12, 1940, respectively, that they had read at least one of these articles containing similar charges made by former District Judge J.C. Meraux.
"Also admitted in evidence was the following resolution adopted by the board of commissioners of BLD on December 17, 1941:
"1. WHEREAS, the Buras Levee District is situated wholly within the Parish of Plaquemines and with the Twenty-fifth Judicial District, of which said Parish is a part, and Leander H. Perez is and was at all times hereinafter referred to the elected and acting District Attorney of said Twenty-fifth Judicial District and ex officio attorney for this Board; and
"2,(a) WHEREAS, this Board, as then constituted, advised and influenced by said Perez as its attorney, did on June 11, 1938, grant two separate oil, gas and mineral leases on separate areas of land owned by it to the Delta Development Company, Incorporated, which leases are recorded in Conveyance Office Book 88, page 453 and page 454, of Plaquemines Parish, and are still outstanding; and
"(b) WHEREAS, this Board is informed and believes that, while acting as attorney for this Board and advising it with respect to said leases, the said Perez was, and is now, also attorney for said Delta Development Company, Incorporated, and did then and does now substantially own and absolutely control said Company; and
*140 "(c) WHEREAS, this Board is informed and believes that the said Delta Development Company, Incorporated, has received and continues to receive large sums, as attorney fees, dividends and other payments, and other persons associated with the said Perez have received and continue to receive large sums, all on account of said leases and the development and production of oil thereunder, and in violation of the rights of this Board; and
"3,(a) WHEREAS, this Board, as then constituted advised and influenced by said Perez, as its attorney, did on September 13, 1928, grant an oil, gas and mineral lease on land owned by it to Robert J. Lobrano, which lease is recorded in Conveyance Office Book 66, page 266, of Plaquemines Parish, and said lease is still outstanding; and
"(b) WHEREAS, in subsequent transactions with respect to said lease, ratified and approved by this Board, as then constituted, under the advice and supervision of the said Perez, the said Lobrano acquired contracts for oil payments and royalties, and assigned interests therein to the said Delta Development Company, Incorporated, and
"(c) WHEREAS, this Board is informed and believes that while acting as attorney for this Board and advising it with respect to said lease and said subsequent transactions, the said Perez was and is now, also attorney for the said Lobrano and the said Delta Development Company, Incorporated, and did then and does now substantially own and absolutely control said Company; and
"(d) WHEREAS, this Board is informed and believes that the said Lobrano and the said Delta Development Company, Incorporated, have received and continue to receive large sums, and the said Perez has received and continues to receive from said Lobrano and said Delta Development Company, Incorporated and from others, large sums as attorney fees, dividends and other payments, and other persons associated with the said Perez have received and continue to receive large sums, all on account of said lease and the development and production of oil thereunder, and in violation of the rights of this Board; and
"4,(a) WHEREAS, this Board, as then constituted, advised and influenced by the said Perez, as its attorney, did on June 2, 1928, grant an oil, gas and mineral lease on land owned by it to George W. Zeigen, which lease is recorded in Conveyance Office Book 65, page 489, of Plaquemines Parish, and did on August 18, 1928, grant an oil, gas and mineral lease on lands owned by it to Robert J. Lobrano, which lease is recorded in Conveyance Office Book 66, page 210, of said Parish, and said leases are still outstanding; and (b) WHEREAS, in subsequent transactions with respect to said leases, ratified and approved by this Board, as then constituted, under the advise and supervision of the said Perez, the said leases were brought under one title in the said Lobrano, and the said Lobrano acquired contracts for oil and sulphur payments and assigned interests therein to the Louisiana Coastal Lands, Inc.; and (c) WHEREAS, this Board is informed and believes that while acting as attorney for this Board and advising it with respect to said leases and said subsequent transactions, the said Perez has received and continues to receive from said Lobrano and said Louisiana Coastal Lands, Inc., and from others, large sums as attorney fees, dividends and other payments, and other persons associated with the said Perez have received and continue to receive large sums, all on account of said leases and the development and production of oil and sulphur thereunder, in violation of the rights of this Board; and
"5,(a) WHEREAS, this board, as then constituted, advised and influenced by the said Perez, as its attorney, did on February 6, 1937, grant an oil, gas and mineral lease on lands owned by it to the Creole Oil Company, Inc., which lease is recorded in Conveyance Office Book 83, Page 510, and is still outstanding; and
"(b) WHEREAS, this Board is informed and believes that, while acting as attorney for this Board and advising it with respect to said lease, the said Perez was, and is *141 now, also attorney for said Creole Oil Co., Inc., and did then and does now substantially own and absolutely control said Company; and
"(c) WHEREAS, this Board is informed and believes that the said Creole Oil Company, Inc., has received and continues to receive large sums, and the said Perez has received and continues to receive from said Creole Oil Company, Inc., and from others large sums as attorney fees, dividends and other payments, and other persons associated with said Perez have received and continue to receive large sums, all on account of said lease and the development and production of oil thereinunder, and in violation of the rights of this Board; NOW THEREFORE,
"Section 1. BE IT RESOLVED BY THE BOARD OF COMMISSIONERS OF THE BURAS LEVEE DISTRICT, That, for the reasons set out in the foregoing preamble, there is a real necessity for the employment of special attorneys by this Board in each of the special matters described, and this Board does hereby employ Thos. E. Furlow and Wm. J. Blass of New Orleans as special attorneys and counsel. Said special attorneys are hereby authorized and empowered, in the same behalf of this Board, to make full and complete investigation of each of the oil, gas and mineral leases herein described and all amendments and supplements thereto, of all agreements and assignments affecting bearing upon or relating to said lease or to rents, royalties and other payments thereunder or in connection therewith, of development, operation and production under said lease, and of any and all transactions with respect to said lease or to development, operation and production thereunder; and said special attorneys are hereby further authorized and empowered, in the name and behalf of this Board, to make such demands and to institute and prosecute to the conclusion such suits as may be necessary for the recovery of this Board of any moneys, rights or interests to which it may be entitled under each of said leases or any transactions with respect thereto or to development, operation and production thereunder, and such suits as may be necessary to annul or rescind said lease. The leases to which the employment of said special attorneys relates are: (1) To Delta Development Company, Inc., June 11, 1938, recorded in C.O.B. 88, p. 453; (2) to Delta Development Company, Inc., June 11, 1938, recorded in C.O.B. 88, p. 454; (3) to Robert J. Lobrano, September 13, 1928, recorded in C.O.B. 66, p. 268; (4) to George W. Zeigen, June 2, 1928, recorded in C.O.B. 65, p. 489, and to Robert J. Lobrano, August 18, 1928, recorded in C.O.B. 66, p. 210, which leases were later combined under one title; (5) to Creole Oil Company, Inc., February 6, 1937, recorded in C.O.B. 85, p. 510; all of which are described in the foregoing preamble.
"Section 2. BE IT FURTHER RESOLVED, etc., That, upon approval of this resolution by the Governor and the Attorney General, and written approval and acceptance by said attorneys, this Board will pay for their services in each of the five special matters above described, to the said Furlow Five Hundred Dollars and to the said Blass Three Hundred Dollars; and this Board will advance to said attorneys funds for their necessary and actual expenses in performing their duties hereunder, not to exceed $500.00. This Board reserves the right upon approval of the Governor and the Attorney General, to make such further agreement with said attorneys as may be necessary or proper, amending or supplementing the contract evidenced by this resolution and the written approval and acceptance thereof by said attorneys. (Underscoring added.)"
Thus, it is clear that, while they may not have had the actual proof, the BLD board and its attorneys, Furlow and Blass, who also represented the GPLD in most of the legal proceedings filed about 1940, were informed and believed that this public official had received and was receiving large sums of money from Delta on account of the mineral leases involved in this suit which he had advised and influenced the board to execute.
*142 "In this court's opinion, this certainly was sufficient notice to excite the attention of both levee districts (GPLD's knowledge presumptively coming to it from its attorneys Furlow and Blass) and to put them on inquiry.
"Under Cartwright such notice or knowledge would start the running of prescription unless there was something else that prevented the levee boards from going forward with the inquiry and discovering sufficient facts to file suit.
"In this regard the plaintiff also contends that it and its predecessors were legally barred by Judge Perez and his sons from asserting this cause of action.
"In September, 1941, the BLD and GPLD boards passed resolutions to employ attorneys Thomas E. Furlow and William J. Blass to investigate their financial affairs and all transactions with respect to their lands, leases, etc., and to file any legal proceedings found necessary to protect their rights. Several suits were filed by both Judge Perez and by the levee boards which involved the legality of such employment. Three of these went to the Supreme Court, which affirmed visiting District Judge Henry L. Himel's decisions enjoining the attorneys' employment and representation. Board of Commissioners v. Perez, 202 La.655, 12 So.2d 670 (1943). The basis of this decision was that under Act 125 of 1912 the district attorney was the regular attorney for the levee boards and the statute prohibited the employment of special counsel `unless a real necessity exists therefor made to appear by a resolution thereof, stating fully the reason....' The `real necessity' for the employment alleged in the petitions was Judge Perez's conflict of interest in regard to claims: (a) to recover the boards' ratable share of severance taxes allocated to the parish, and (b) to nullify certain contracts between the boards and the parish and recover lands, leases, royalties and money to which the boards had been deprived by reason of those contracts. BLD also alleged that it was necessary for Furlow and Blass to represent it in a suit by the state against Gulf Refining Company, et al. None of these particularly concerned the matters involved in this suit.
"While the aforesaid cases were pending, Suits Nos. 1733 and 1734 were instituted in this court, seeking the same relief with respect to the BLD resolution of December 17, 1941, quoted above. Judge Himel made the same ruling, saying no necessity for such special employment had been established and that the December resolution was simply an attempt to get around his decisions in the prior cases. No evidence of the `real necessity,' as related in that resolution, was offered by the boards at the trial. Although appeals were granted in both cases, they were not perfected.
"Undoubtedly, the decisions in these suits, as well as the criminal actions against certain board members which were filed and subsequently dismissed by Judge Perez, were extremely discouraging, particularly in view of the political climate then existing in the parish. However, they did not bar or effectually eliminate further proceedings to uncover the facts and proof if the levee boards had decided to pursue the matter. Judge Himel enjoined the boards from employing Messrs. Furlow and Blass as special counsel because no evidence of a real necessity was presented. But he also suggested that if the boards were being deprived of large sums of money by Judge Perez's alleged conflicts of interest, there was nothing to prevent them from having the attorney general file suit to recover same. The record shows that this state official had approved the resolution quoted above and his office did represent the boards in other legal proceedings around this time.
"Why the appeals were not perfected in the two cases in which the December, 1941, resolution was involved is not known. Nor has it been shown why evidence was not offered at the hearing to establish the necessity for special counsel. The plaintiff herein suggests that no such proof was then available to the boards. This may have been so. However, Act 304 of 1940 (La.R.S. 13:4861 et seq.) specifically provided *143 levee boards a right of action for discovery and investigation of their property rights and there is no reason why Judge Perez could not have been called on cross examination in the suits that were tried and questioned on the subject.
"There is no proof in this record that he controlled the district court or the appellate courts of the state. Therefore, in spite of rumors to that effect which have persisted even to this date, this court cannot assume that was the case. But even if so, there was adequate time between the death of Judge Perez in 1969 and August 25, 1973, (ten years before this case was filed) to institute legal and discovery proceedings to obtain proof of the true facts.
"As best the court can determine, in 1941 the levee boards and their attorneys had almost as much proof as the plaintiff and its attorneys had when the present suit was filed. And if it could have been filed in 1983 and prosecuted now, we see no valid reason why the levee boards could not have done so in 1941 had they proceeded diligently.
"The plaintiff also asserts that the continuing concealment of the facts by Judge Perez and his sons prevented prescription from running. Of course, concealment which causes one to be ignorant of the existence of a cause of action is one of the reasons for the application of contra non valentem. This is so whether it is done by the defendant or by others. However, once knowledge, either actual or constructive, is obtained by the one having a cause of action, prior concealment is no longer of any significance because then there is nothing which prevents that party from going forward with the inquiry and filing suit. Continued concealment thereafter can only be an authoritative factor if it prevents discovery of the facts to the extent that the inquirer is effectively prevented thereby from filing suit. And to repeat, this record does not disclose any reason why in the early 1940s the boards could not have obtained through discovery the information needed to institute legal proceedings had they exercised reasonable diligence."
ESTOPPEL
Judge Swift continued: "Lastly, the plaintiff contends that the defendants are estopped to plead prescription because of their silence and concealment of Judge Perez's acquisition and their ownership of the overriding royalty interests. These are simply among the factors to be considered in deciding whether contra non valentem is applicable and only effective if they are the cause of suit not being filed. As heretofore pointed out, such concealment and silence were not sufficient to prevent the levee boards from making proper inquiry that would have led to knowledge of the facts in 1941 had they proceeded with reasonable diligence. The continued concealment thereafter by Judge Perez and his sons did not prevent the present suit from being filed. And, as mentioned, there was little, if any, additional proof available to the plaintiff in August, 1983, than in 1941.
"This court therefore concludes that ten years liberative prescription under Article 3544 (now Article 3499) of our 1870 Civil Code commenced to run in 1941 with respect to the cause of action asserted herein and it accrued over 30 years before this suit was filed."
DECREE
We have concluded that liberative prescription can run against GPLD and BLD, that this suit instituted by GPLD and BLD, based on allegations of fraud, breaches of fiduciary duties and conflicts of interest, is a personal action, subject to ten years liberative prescription and that prescription commenced to run in 1941. In view of the foregoing reasons set forth in this opinion, we affirm the trial court's judgment in favor of all defendants sustaining their peremptory exception of prescription. All costs of this appeal to be borne by appellants.
AFFIRMED.

ON PETITION FOR REHEARING
PER CURIAM.
Plaquemines Parish Commission Council has correctly pointed out that the *144 Buras Levee District alone, not both levee boards as it was inadvertently referred to in our opinion, passed the 1941 resolution. Because of this, Plaquemines Parish Commission Council argues that the Buras Levee District's knowledge of its cause of action, illustrated by the 1941 resolution, was not imputable to the Grand Prairie Levee District and therefore, the principle of contra non valentem was applicable to the Grand Prairie Levee District's cause of action to toll the running of prescription. We disagree.
We are convinced, as was Judge Swift, that the knowledge acquired by Messrs. Furlow and Blass, who were acting in concert as attorneys for both levee boards in the investigation of Perez's affairs and his link with Delta Development, was imputable to each levee board. From this premise of constructive knowledge by both levee boards, we reviewed the entirety of the evidence as it pertained to notice for the purpose of prescription. Our decision that Plaquemines Parish Commission Council's claim had prescribed was not based solely on the 1941 resolutionthe evidence presented by defendants to establish notice for the commencement of the running of prescription was considerable. The full text of the 1941 Buras Levee District resolution was printed for the reason that it outlined in great specificity the degree of knowledge the levee boards possessed concerning Perez's involvement in the subject base leases. Accordingly, Plaquemines Parish Commission Council's request for a rehearing is denied.
NOTES
[1] The GPLD and BLD had jurisdiction and control over the Plaquemines Parish lands and minerals until, in 1961, a home rule charter was adopted, creating the PPCC and transferring control over parish lands from the GPLD and BLD to PPCC.
[2] Delta is a Delaware Corporation formed in 1941. It is a successor to the Louisiana corporation formed in 1934 bearing the same name. For the purposes of the opinion, they will be treated one and the same.
[3] Delta is owned entirely by the four children of the late Leander H. and Agnes O. Perez: Leander H. Perez, Jr., Chalin O. Perez, Betty Perez Carrere and Joyce Perez Gelpi. In addition to the children, their husbands and wives as well as two minor children of Mrs. Gelpi and her first husband, John D. Eustis, now deceased, have been named as defendants.
[4] Leander Perez, Jr. was Assistant District Attorney from 1954 to 1960. In 1960 he was elected District Attorney, a position he held until 1985.

Chalin Perez served as a member of the PPCC from 1967 to 1983, holding the position of President from 1967 to 1982 and the position as Commissioner throughout the entirety of his term.
[5] All three base leases are printed on standard pre-printed forms. They provide for certain cash bonuses and a one-eighth royalty. Act 66 of 1928 specifically granted levee boards the authority to execute mineral leases on lands under their administration "... under such terms and conditions as said boards ... may deem best, and for such time as they may find proper, provided the royalty to be received shall not be less than one eighth of such oil and gas...." (emphasis added).
[6] We find that except for the base leases and accompanying resolutions of the levee boards authorizing the execution of these leases, there is no additional evidence pertaining to what transpired in the granting of the base leases. The 25th Judicial District Clerk of Court is unable to locate the levee boards' minute books for 1936 and 1938, and all members of the levee boards have either died or are physically and mentally incapable of testifying.
[7] 25th Judicial District Court, Parish of Plaquemines, No. 13-546.
[8] The BLD was created by Act 18 of 1894. Section 7 of the Act (See also LSA-R.S. 38:787) states, in part, "that said board of commissioners shall ... be constituted a body public or political corporation invested with powers inherent in the said corporation; they shall have authority to sue and be sued ...."

The GPLD was created by Act 24 of 1898. Pursuant to Section 7 of the Act (see also, LSA-R.S. 38:997), the GPLD was likewise granted similar broad powers.
[9] For us not to recognize this distinction would be, in the words of Judge Swift, "[t]o say that the constitutional prohibition against the state (or levee districts) selling or otherwise alienating its lands and mineral interests therein prevents a mineral lessee of state lands from conveying to another an overriding royalty interest (or share in its interest in production) would be tantamount to prohibiting the state from leasing its lands and mineral interests to others and, of course, is untenable ...." (citations omitted).
[10] La.C.C. art. 526: The owner of a thing is entitled to recover it from anyone who possesses or detains it without right and to obtain judgment recognizing his ownership and ordering delivery of the thing to him. Art. 159 of the Louisiana Mineral Code states that "[M]ineral rights may not be established by acquisitive prescription," articulating the holding in Savage v. Packard, 218 La.637, 50 So.2d 298 (1950).
[11] La.C.C. Pro. art. 422 reads, in part: A mixed action is one brought to enforce both rights in, to or upon immovable property and a related obligation against the owner, claimant, or possessor thereof.
[12] In Schwegmann v. Schwegmann, 441 So.2d 316 (La.App. 5th Cir.1983), writ denied 443 So.2d 1122 (La.1984), the Fifth Circuit declared that "it is clear the Louisiana Civil Code prohibits the imposition of a constructive trust on property." Id. at 322-23. (citations omitted.) While it is arguable that this was unnecessary to the disposition of the casethe lack of a fiduciary relationship between the partieswe adopt this reasoning as it pertains to any notion of a constructive trust in Louisiana.
[13] PPCC relies upon decisions in Peterson v. Moresi, 191 La.932, 186 So. 737 (1939); State ex rel. Hyam's Heirs v. Grace, 197 La.428, 1 So.2d 683 (1941); Judson v. Connolly, 4 La.Ann. 169 (1849); and Wurzlow v. Placid Oil, 282 So.2d 140 (La.1943); to support its claim that its action is real and imprescriptible. All are distinguishable because ownership was claimed by virtue of an instrument or written act translative of title.
[*] The succession of John Douglas Eustis, Sr., filed in this court in 1971 under Docket No. 13-546 does include his interest in the overrides by vague descriptions. The tax compilations were approved by Luke A. Petrovich as attorney for the tax collector. He was also a member of the Council. What examination he made of the property inventories was not established. However, it is presumed that his testimony on the subject would be adverse to plaintiff, since he was not called as a witness.