807 F.2d 1234
 15 Bankr.Ct.Dec. 898, Bankr. L. Rep. P 71,629
 In re EMERALD OIL CO., Debtor.
William C. SANDOZ, Trustee, Plaintiff-Appellee,
Wheless Drilling, New Park Drilling Fluids, Inc., and Aztec
Corp., Plaintiffs-Appellees,
v.
David S. BENNETT and Sam P. Bennett, Defendants-Appellants.
 No. 86-4134.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 20, 1987.
 
 Vance R. Andrus, Lafayette, La, for David S. Bennett.
 Patrick S. Ottinger, Plauche Hartley, Lapeyre & Ottinger, Lafayette, La, for Sam P. Bennett.
 James Robert Jeter, Shreveport, La, for plaintiffs-appellees.
 Gerald H. Schiff, Opelousas, La., for trustee.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before GARZA, DAVIS, and JONES, Circuit Judges.
 EDITH H. JONES, Circuit Judge:
 
 
 1
 Appellants David S. Bennett ("Mrs. Sam P. Bennett") and Sam P. Bennett ("Mr. Bennett"), former principals of Debtor Emerald Oil Co. ("Emerald"), appeal the rejection of a compromise between them and the debtor's estate. We affirm the district court's decision.
 
 I.
 
 2
 This dispute centers around a 1/8 working interest in an oil and gas lease known as the Williams B, located in St. Martin Parish, Louisiana. In March 1979, Emerald solicited a letter agreement from Dow Chemical Company, whereby Dow offered to sell Emerald a 1/4 working interest in the subject property for $50,000. This letter agreement was dated March 22, 1979, and Emerald formally accepted it on April 4, 1979. By a letter assignment dated March 26, 1979, and accepted on April 9, 1979, Emerald purported to assign one-half of this interest to Mrs. Bennett, a 50% shareholder of Emerald, for $100 and other valuable consideration.[1] This assignment was not recorded.
 
 
 3
 Despite technical reverses, by late 1979 and early 1980 there were strong signs that the Williams B# 1 well then being drilled would produce gas in significant quantities. On February 25, 1980, Emerald recorded an assignment of oil and gas leases, whereby it assigned 50% of its interest in the lease to Mrs. Bennett and 50% to Petrojack International Corporation. This assignment included a provision making it subject to the March 22, 1979 assignment from Dow to Emerald, but there was no mention of the earlier purported assignment to Mrs. Bennett.
 
 
 4
 The Williams B# 1 well was completed on March 26, 1980. Shortly thereafter, an expert hired by Mr. Bennett estimated the after-tax value of his wife's 1/8 interest income stream from the well at $3,164,900.00. Five days later, Mrs. Bennett paid Emerald $175,000.00 as partial payment for her share of the drilling costs.[2]
 
 
 5
 On May 16, 1980, Emerald filed for protection under Chapter 11 of the Bankruptcy Code, Title 11 U.S.C. On August 11, 1980, William C. Sandoz was appointed as trustee in the case, and the trustee thereafter instituted an adversary proceeding to recover, as a fraudulent conveyance under 11 U.S.C. Sec. 548, the 1/8 interest in the Williams B lease conveyed to Mrs. Bennett. A second action was filed against Mrs. Bennett for money due the debtor's estate, in the form of drilling costs owed by Mrs. Bennett but actually paid by Emerald. The trustee later filed a third action against both Mr. and Mrs. Bennett, seeking to pierce Emerald's corporate veil and hold the Bennetts personally responsible for the corporation's debts. These adversary proceedings were consolidated in early 1983.
 
 
 6
 In February 1983, the trustee filed an application to compromise the three adversary proceedings, and several members of the unsecured creditors' committee timely objected. The proposed compromise provided that Mrs. Bennett would grant the trustee and the debtor's estate a production payment of 80% of her 1/8 share of all production until the estate received $500,000.00, plus interest at the Chase Manhattan Bank prime rate plus two percent, with the production payment declining to 20% if certain conditions arose (reworking the well, drilling of new exploratory or developmental well, etc.). The effect of this compromise would be to require Mrs. Bennett to pay no more than her pro rata share of the drilling costs of the well, a result which implicitly affirms the validity of the transfer of the interest to her. Because the validity of that transaction, measured against 11 U.S.C. Sec. 548, was the crux of the dispute in the adversary proceedings, and Mrs. Bennett conceded that if the assignment to her was valid, she was responsible for her apportioned share of drilling costs, the compromise would settle the adversary cases by conceding the validity of the transfer to Mrs. Bennett.
 
 
 7
 After a hearing, the bankruptcy judge approved the compromise. 61 B.R. 656 (Bankr.W.D.La.1984). On appeal, the district court reversed the approval and remanded the case for further findings. In September 1985, after a second hearing, the bankruptcy court entered new findings and again approved the proposed compromise. Once more, however, the district court reversed, holding that the bankruptcy court had abused its discretion in approving the compromise. The Bennetts now appeal.
 
 II.
 
 8
 As the principal basis for finding the proposed compromise to be "fair and equitable," the bankruptcy court held that the trustee faced an "extreme if not impossible task" in attempting to set aside the transfer to Mrs. Bennett. The district court disagreed with this assessment and held that as the trustee appeared to have a strong case for avoiding the transaction, the proposed compromise was not fair and equitable.
 
 
 9
 Thus, the issue in this appeal is whether the trustee could avoid the 1/8 working interest transferred to Mrs. Bennett. Under 11 U.S.C. Sec. 548(a)(2), the trustee can set aside a transfer of the debtor's property as fraudulent upon a finding that the transfer:
 
 
 10
 1. Occurred within one year of filing;
 
 
 11
 2. Was for less than "reasonably equivalent value"; and
 
 
 12
 3. Was made when the debtor was insolvent.
 
 
 13
 Examining these requirements, we conclude that the trustee not only had a strong case for avoiding the transfer, but probably could do so as a matter of law.
 
 1. Time of the transfer
 
 14
 Section 548(d)(1) of the Bankruptcy Code provides:
 
 
 15
 For the purposes of this section, a transfer is made when such transfer is so perfected that a bona fide purchaser from the debtor against whom such transfer could have been perfected cannot acquire an interest in the property transferred that is superior to the interest in such property of the transferee....
 
 
 16
 Appellants argue that the conveyance to Mrs. Bennett was made on April 9, 1979, when she accepted an assignment from Emerald and became obligated for half of Emerald's share of the drilling costs. Emerald sought protection in bankruptcy on May 16, 1980, some thirteen months later, leading the Bennetts to assert that the transfer cannot be avoided under Sec. 548.
 
 
 17
 For purposes of Sec. 548(d)(1), state law on time of perfection controls. Under Louisiana law, any conveyance of real property, including mineral interests, is unperfected until properly recorded:
 
 
 18
 All sales, contracts and judgments affecting immovable property, which shall not be so recorded, shall be utterly null and void, except between the parties thereto. The recording may be made at any time, but shall only affect third persons from the time of the recording.
 
 
 19
 La.Rev.Stat.Ann. Sec. 9:2756 (West 1986).[3] See also La.Civ.Code.Ann. art. 2442 ("The sale of any immovable made under private signature, shall have effect against the creditors of the parties, and against third parties in general, only from the day such sale was registered according to law...." ). It is undisputed that the April 1979 assignment to Mrs. Bennett was not recorded. Her title was perfected only through the recorded, February 1980 assignment,[4] less than 90 days prior to the bankruptcy filing.
 
 
 20
 Appellants, however, contend that it is the customary practice in the oil industry for the operator to retain all legal title until a well is completed and not to record assignments of partial interests. Mrs. Bennett consequently asserts that as of April 9, 1979, she received an equitable interest exempted from the definition of property of the debtor's estate by Sec. 541(d) of the Bankruptcy Code, and thus the transfer to her was made more than a year before the bankruptcy.[5]
 
 
 21
 This court has noted that pursuant to Sec. 541(d), a debtor's estate in bankruptcy does not include property in which the debtor holds bare legal title subject to the equitable interests of third parties. See, e.g., Vineyard v. McKenzie (In re Quality Holstein Leasing), 752 F.2d 1009 (5th Cir.1985); Wisconsin v. Reese (In re Kennedy & Cohen, Inc.), 612 F.2d 963 (5th Cir.), cert. denied, 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980); See also Boyd v. Martin Exploration Co., 56 B.R. 776 (E.D.La.1986). Consequently, "[a]s a general rule, it must be held that section 541(d) prevails over the trustee's strong-arm powers. Although these powers allow a trustee to assert rights that the debtor itself could not claim to property, Congress did not mean to authorize a bankruptcy estate to benefit from property that the debtor did not own." In re Quality Holstein, 752 F.2d at 1013. To profit from Sec. 541(d), a party must demonstrate that state law impresses property that the debtor holds with an equitable interest in his favor that attached prior to bankruptcy. Id. at 1013-1014.
 
 
 22
 However, appellants' Sec. 541(d) claim founders on Louisiana law, as nothing in that state's statutory or case law establishes an equitable interest in Mrs. Bennett. The doctrine of constructive trusts or equitable interests does not coexist comfortably with Louisiana's civil law tradition. See Plaquemines Parish v. Delta Development Co., 486 So.2d 129, 135-37 (La.Ct.App.1986). In any event, this case is distinguishable from those that have recognized some form of equitable interests under Louisiana law. This case involves no unfaithful fiduciary, Grand Isle Campsites, Inc. v. Cheek, 262 La. 5, 262 So.2d 350 (1972), contra Plaquemines Parish, 486 So.2d at 135-37, no partnership property held in the name of a partner, Decatur-St. Louis Combined Equity Properties, Inc. v. Abercrombie, 411 So.2d 677 (La.Ct.App.1982), and no royalty interest earned by, paid for, and specifically held for the benefit of employees, Boyd v. Martin Exploration Co., 56 B.R. 776 (E.D.La.1986). To the extent Mrs. Bennett seeks refuge in "equity," Louisiana law offers none for her interest, which was acquired contrary to the terms of Dow's mineral lease and, as will be shown, for an unreasonably low sum.
 
 
 23
 2. "Reasonably equivalent value"
 
 
 24
 We need not enter the thicket created by our court's decision in Durrett v. Washington Nat. Ins. Co., 621 F.2d 201, 203 (5th Cir.1980)[6] to conclude that Mrs. Bennett almost surely did not pay Emerald a "reasonably equivalent value" for her interest in the Williams B lease. On or around February 25, 1980, the relevant date of perfection of the transfer, she paid nothing. In December 1979, she paid Emerald approximately $15,000 and made another payment of $175,000 in April, 1980. Although the exact value of Mrs. Bennett's interest in the well in early 1980 is disputed, the estimates at trial ranged upward from $2 million. To mitigate this gross undercompensation, appellants contend that the assignment obligated Mrs. Bennett for one half of Emerald's share of the drilling costs, and that this assumption of liability constituted "reasonably equivalent value" for the assignment. However, the February 25, 1980 assignment only provides that it is "subject to" the prior assignment from Dow. Under Louisiana law, one who assumes a mortgage becomes personally bound thereon, but one who purchases "subject to" a mortgage incurs no personal liability. HEP Development Corp. v. Mouton, 256 So.2d 744, 745 (La.Ct.App.1971). In the same way, Mrs. Bennett was not personally liable for half of Emerald's share of the drilling costs because she took "subject to" the prior assignment, and thus no obligation exists that might constitute reasonably equivalent value.[7]
 
 3. Made while insolvent
 
 25
 Because the parties have stipulated that at all times after January 30, 1980, Emerald was insolvent, the transfer perfected on February 25, 1980 falls within this criterion of Sec. 548.
 
 III.
 
 26
 We realize that the standard for reviewing a bankruptcy court's approval of a compromise is a high one, and such decisions should not be disturbed except for an abuse of discretion. In re Jackson Brewing Co., 624 F.2d 599, 602-03 (5th Cir.1980); see also In re AWECO, 725 F.2d 293 (5th Cir.1984). A bankruptcy court is ordinarily in the best position, as the trial court and as the ongoing supervisory court for the bankruptcy proceeding, to determine whether a compromise is in the best interest of the estate and "fair and equitable". Protective Committee for the Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1, 9 (1968).
 
 
 27
 In the instant case, the bankruptcy court found that the compromise was reasonable and in the estate's best interests in light of its conclusion that the trustee might not succeed in setting aside Emerald's transfer to Mrs. Bennett. However, as discussed above, the trustee not only had a strong case for avoiding the conveyance, he probably could set the transfer aside as a matter of law. In that event, the creditors would receive the benefit of the entire value of Mrs. Bennett's interest in the lease.[8] The "hazards of litigation" do not justify the approved compromise whereby the creditors receive less than one-third of their potential recovery after trial.[9] Based on our analysis, we agree with the district court's conclusion that this result is neither fair and equitable nor in the best interest of the estate.
 
 
 28
 The judgment of the district court is therefore AFFIRMED; the case is REMANDED to the district court for further proceedings consistent herewith.
 
 
 
 [1]
 There is no indication what other consideration was given at that time for the purported assignment
 
 
 [2]
 Based on a total cost of $4,484,934.00 on March 26, 1980, Mrs. Bennett's 1/8 share of the expenses would equal approximately $560,000
 
 
 [3]
 Section 9:2756 is the recent redesignation of La.Civ.Code Ann. art 2266, which was applicable at all material times
 
 
 [4]
 It is not clear whether Mrs. Bennett received marketable title from the February 1980 assignment. As noted by the district court, Dow Chemical's mineral lease, which was the source of Emerald's interest in the property, required the consent of the lessors to any assignment. This approval was obtained for the original assignment to Emerald, but there is no evidence that either Dow or the lessor consented or even knew of either purported assignment to Mrs. Bennett. This issue has not been raised on appeal
 
 
 [5]
 Section 541(d) provides:
 Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest in such a mortgage, sold by the debtor but as to which the debtor retains legal title to service or supervise the servicing of such mortgage or interest, becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.
 
 
 [6]
 While Durrett remains the law of this circuit, other courts and commentators have severely criticized it. See, e.g., Madrid v. Lawyers Title Insurance Corp. (In re Madrid), 725 F.2d 1197, 1202 (9th Cir.) cert. denied, 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984); Abramson v. Lakewood Bank & Trust Co., 647 F.2d 547, 549 (5th Cir.1981) (Clark, J., dissenting); Alden, Gross & Borowitz, Real Property Foreclosure as a Fraudulent Conveyance: Proposals For Solving the Problem, 38 Bus. Lawyer 1605 (1983)
 
 
 [7]
 Appellants assert that the bankruptcy court made a finding of fact on whether the transfer was for "reasonably equivalent value," which we should not upset on appeal. However, the bankruptcy court predicated this finding on the legal conclusion that Mrs. Bennett was obligated for one-eighth of the drilling costs. As she was not so obligated under Louisiana law, the bankruptcy court's finding of fact was premised on a faulty legal conclusion and thus was clearly erroneous
 
 
 [8]
 Pursuant to 11 U.S.C. Sec. 548(c), Mrs. Bennett might seek reimbursement of the amounts she paid Emerald. If she did not succeed, she could file a general unsecured claim against the debtor's estate
 
 
 [9]
 This fraction was reached by conservatively estimating the net value to the estate of Mrs. Bennett's interest [$2 million] in relation to the maximum value of the settlement to the estate [$500,000, plus interest, in a production payment]