## In re DIBERT, BANCROFT & ROSS CO., LTD.

### No. 95–1741.

United States District Court, E.D. Louisiana.

Feb. 12, 1996.

Kevin C. Schoenberger, Law Offices of Kevin C. Schoenberger, New Orleans, LA, and Walter Antin, Jr., the Antin Law Firm, Hammond, LA, for appellants.

Dennis Michael Dendy, Amato & Creely, Gretna, LA, attorney for the Chapter 7 Trustee, Robert Marrero, David M. Culpepper and Omer F. Kuebel (T.A.), III, Draper & Culpepper, APLC, New Orleans, LA, attorneys for Central Progessive Bank, and John M. Bilheimer, U.S. Department of Justice, Tax Division, Washington, DC, attorney for the Internal Revenue Service, for appellees.

## ORDER AND REASONS

FALLON, District Judge.

Before the Court is an appeal from a final order of the United States Bankruptcy Court, Eastern District of Louisiana, entered on May 4, 1995, granting summary judgment in favor of the United States on a complaint filed by the Trustee for interpleader and to determine validity and priority of liens. For the reasons that follow, the judgment of the Bankruptcy Court is AFFIRMED.

I. **BACKGROUND:** In November 1965, Dibert, Bancroft & Ross Co., Ltd. (the "Debtor") entered into an Agreement & Lease with Tangipahoa Parish (the "Parish") for the development and construction of an iron and steel foundry (the "Foundry") using industrial revenue bonds. On September 5, 1967, after completing construction, Debtor 1) sold the Foundry to the Parish for $2,475,614.00, and 2) entered into an Act of Acknowledgement with the Parish, which recognized that Debtor had complied with obligations under the Agreement & Lease and that the lease of the Foundry back to the Debtor (the "Lease") had become effective. The Lease gave Debtor the option to repurchase the Foundry for $1000 once the revenue bonds had been paid.

On July 8, 1986, after paying the amounts due on the revenue bonds, Debtor executed a Leasehold Collateral Mortgage (the "Leasehold Mortgage") for $2 million in favor of "Bearer." Debtor then borrowed funds from the Ross family (John, Gloria, and Carolyn Ross and Kathleen Penick) and Hancock National Bank (collectively, the "Ross Group"), and gave the Leasehold Mortgage as security. The Leasehold Mortgage, which was recorded on December 16, 1986, encumbered Debtor's rights under the Lease (the "Leasehold"). From 1987 through 1989, numerous judicial mortgages were recorded against the Debtor as well as federal tax liens filed on September 21, 1988, November 15, 1988, January 19, 1989, March 31, 1989, and June 22, 1989.

On September 5, 1989, the Parish sold the Foundry to Debtor by Act of Cash Sale. The Act of Cash Sale stated that the Lease and the Leasehold Mortgage would continue in effect. Ten days later, Debtor filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. The Act of Cash Sale was not recorded until September 18, 1990.

On October 9, 1992, the Bankruptcy Court approved the Trustee's sale of the foundry property, and on October 30, 1992, the Trustee sold the property, which included: 1) the Foundry, which is at issue in this proceeding, and 2) the "rolling mill" property (the "Rolling Mill"). After the sales, the Bankruptcy Court allocated the proceeds between the Foundry and the Rolling Mill.[1] The Trustee then filed an interpleader action, seeking to determine the validity and priority of the various liens in order to facilitate a proper distribution of the Foundry proceeds. On May 4, 1995, the Bankruptcy Court granted summary judgment in favor of the United States, finding that the United States had first priority over the Foundry proceeds because the Leasehold, which formed the collateral for the Leasehold Mortgage (held by the Ross Group), had been extinguished by confusion when the Debtor acquired full ownership of the property subject to the Lease. It is from this judgment that the Ross Group appeals.

II. **ANALYSIS:** The Ross Group asserts several grounds for appeal, and although

---

1. Neither the Ross Group nor the United States claim any interest in the proceeds of the Rolling Mill.

there is considerable overlap in the assertions of error as presented by appellants, the issues on appeal can be classified as follows: 1) whether the Lease was extinguished by confusion; 2) whether the mortgage encumbered not only the Leasehold but also certain movables allegedly owned by Debtor and not leased from the Parish, so that the Ross Group would have priority over at least a portion of the Foundry proceeds; and 3) whether the 1992 judgment of the Bankruptcy Court, allocating the proceeds between the Foundry and the Rolling Mill, was in error. Although this Court reviews conclusions of law de novo, the Bankruptcy Court's findings of fact may not be set aside unless found to be clearly erroneous. Fed. R.Bankr.P. 8013.

## A. *Whether the Lease was Extinguished by Confusion:*

■ Under Louisiana law, "[w]hen the qualities of obligee and obligor are united in the same person, the obligation is extinguished by confusion." *See* La.Civ.Code Ann. art. 1903 (West 1987). As stated earlier, the Bankruptcy Court held that the Lease, and consequently the Leasehold Mortgage,[2] were extinguished by confusion when Debtor purchased the Foundry from the Parish, thereby uniting in Debtor the qualities of both obligee and obligor with respect to all obligations under the Lease.[3]

The Ross Group asserts that the Lease was not extinguished by confusion because: 1) the public records doctrine barred the Debtor from acquiring full ownership of the Foundry in September 1989, given that the Act of Sale was not recorded until September 1990; 2) the Act of Cash Sale provided that the Lease and the Leasehold Mortgage would continue in effect; and 3) the sale from the Parish to Debtor was void as violative of the Debtor's covenant in the Leasehold Mortgage not to surrender or terminate the Leasehold.

■ **1.** *Public Records Doctrine:* The Ross Group argued to the Bankruptcy Court, and reurges on appeal, that confusion did not take place when Debtor purchased the Foundry from the Parish because the sale was void until the Act of Sale was recorded in September 1990. In Louisiana, the public records doctrine is embodied in Louisiana Revised Statute § 9:2756, which provides that all sales, contracts, and judgments affecting immovable property, if not recorded, "shall be utterly null and void, *except between the parties thereto.*" La.Rev.Stat.Ann. § 9:2756 (West 1991) (emphasis added).[4] As the Bankruptcy Court explained, although an unrecorded conveyance is void as to third parties, as between the parties, "the unrecorded conveyance makes the grantee the actual owner of the property." *Baker v.*

**2.** Article 3319 of the Louisiana Civil Code sets forth the methods by which a mortgage is extinguished. The first mode of extinction listed is "the extinction or destruction of the thing mortgaged." La.Civ.Code Ann. art. 3319(1) (West 1994). The Ross Group, citing *Coen v. Gobert,* 154 So.2d 443 (La.Ct.App.1963), argues that this rule does not apply here because the cases interpreting article 3319(1) have dealt with the physical destruction of the thing mortgaged. This argument is wholly without merit. The *Coen* case dealt only with physical extinction because the thing mortgaged in that case was a corporeal thing—a dwelling. In this case, the thing mortgaged was a Leasehold—an incorporeal thing. Incorporeal things, such as rights and obligations, cannot be felt or touched, but they do exist in the eyes of the law, nonetheless, and are "comprehended by the understanding." La.Civ. Code Ann. art. 461 (West 1980). They are born of the law or by contract and are extinguished not by fire or deluge, but by the operation of law or contract. Here, the extinction of the thing mortgaged, the Leasehold (Debtor's rights under

the Lease), occurred by operation law when Debtor acquired the property subject to the Lease in full ownership.

**3.** *See* Saúl Litvinoff, *The Law of Obligations, in 5 Louisiana Civil Law Treatise* (1992) (Confusion "takes place when a lessee acquires ownership of the leased property, thereby extinguishing his obligation to pay rent.") (citing *Fernandez v. Soulie,* 28 La.Ann. 31 (1876) and *Bartels & Dana v. Their Creditors,* 11 La.Ann. 433 (1856)).

**4.** See also Civil Code article 1839, which provides: "A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property has been actually delivered and the transferor recognizes the transfer when interrogated on oath. An instrument involving immovable property shall have effect against third persons only from the time it is filed for registry in the parish where the property is located." La.Civ.Code Ann. art. 1839 (West 1987).

*Atkins,* 107 La. 490, 32 So. 69 (1902).[5] Thus, while Debtor's unrecorded Act of Sale would have been primed by any subsequently filed conveyance or lien (*i.e.,* a creditor of the Parish or a subsequent good-faith purchaser), it was nonetheless translative of ownership. The public records doctrine, therefore, did not prevent the Act of Sale from translating title, thereby investing in Debtor the qualities of both obligee and obligor with respect to all obligations under the Lease.

The Ross Group is correct that " '[f]or confusion to occur the same person must acquire the full and perfect ownership of both sides of the obligation by a conveyance which is translative of title.' " *Langley v. Police Jury of the Parish of Calcasieu,* 201 So.2d 300, 305 (La.Ct.App.), *writ denied,* 250 La. 1034, 201 So.2d 521 (1967) (quoting Comment, *Extinguishment of Obligations by Confusion,* 36 Tul.L.Rev. 521 (1962)). However, the cases cited by the Ross Group are inapposite. For example, in *Langley,* which involved a sale and lease-back of a right of occupancy between a lessee and lessor, the court held that the lease-back would not operate to extinguish the right of occupancy by confusion because the lease-back was not transferred in full but was attached to several conditions. But that is not this case. Here, the sale transferred full, unconditional

ownership of the Foundry to the Debtor.[6] Likewise, in *Department of Culture, Recreation & Tourism v. Fort Macomb Dev. Corp.,* 385 So.2d 1233 (La.Ct.App.), *writ denied,* 394 So.2d 613 (La.1980), the court found that the mortgage at issue was not extinguished by the mortgagee's acquiring of the thing mortgaged (a lease) because the assignment of the lease was not translative of title but hypothecary in nature—a mere security device. Here, the transfer of ownership was unequivocally translative of title.[7]

■ **2.** *The Act of Sale:* The Ross Group argues that even if confusion would occur ordinarily as a matter of law under the circumstances, it did not occur in this case because the Act of Sale purported to prevent such result. The Act of Sale provided in pertinent part:

> "Purchaser [Debtor] agrees that the property herein is subject to [the Leasehold Mortgage].... Nothing contained herein shall be deemed to be a cancellation of [the Lease], which would have the effect of nullifying [the Leasehold Mortgage], and [the Leasehold Mortgage] shall continue to encumber the property purchased by Seller [sic] herein to the fullest extent allowed by law." [8]

**5.** *See also Hibernia Nat'l Bank v. Continental Marble & Granite Co.,* 615 So.2d 1109, 1111 (La.Ct.App.1993) ("As between the parties to an act effecting the transfer of an immovable, effectiveness of the transaction does not depend upon the act's recordation in the public records."). The Ross Group misconstrues the holding in *Hibernia.* Although the *Hibernia* court acknowledged that the unrecorded dation en paiement at issue in that case was ineffective against the intervening judgment lien (filed after execution but before recordation of the dation), the court held that "the dation became effective between [the parties] at the moment the act was executed, not the later moment of its recordation in the public records." *Id.* at 1111. Accordingly, the court "commonsensibly" concluded that at the moment the dation was executed, the mortgages that encumbered the property transferred in the dation were extinguished by confusion. *Id.*

**6.** Nor is the Ross Group's public records argument supported by the Fifth Circuit's decision in *In re Emerald Oil Co.,* 807 F.2d 1234 (5th Cir. 1987). In *Emerald Oil,* the question before the court was whether a transaction could be avoided as a "fraudulent transfer" made within one year prior to the filing of the bankruptcy petition.

For purposes of avoidance under 11 U.S.C. § 548(a)(2), a transfer is deemed to have occurred when it is "perfected" so that a bona fide purchaser could not obtain a superior ranking vis-a-vis the transferee's interest. 11 U.S.C. § 548(d)(1). This concept is wholly distinct from the issue before the this Court, which whether the act was effective between the parties to transfer full and perfect ownership. Clearly, it was.

**7.** The case of *Scott v. Magnolia Petroleum Co.,* 200 La. 401, 8 So.2d 69 (1942), also cited by the Ross Group, is not helpful here because the court did not even reach the appellee's confusion argument, instead affirming on other grounds.

**8.** This Court agrees with the United States that this paragraph, to a large extent, is simply meaningless. While the Parish and the Debtor may have agreed that the Leasehold Mortgage did and would continue to encumber the Foundry, this did not make it so. The Leasehold Mortgage encumbered only the Leasehold, not the Foundry, which was owned by the Parish at the time the Leasehold Mortgage was executed.

The Bankruptcy Court found this language to be without effect under Civil Code article 7, which provides that parties "may not by their juridical acts derogate from laws enacted for the protection of the public interest." La.Civ.Code Ann. art. 7 (West 1993). The Bankruptcy Court recognized that Louisiana courts have upheld the rights of parties to renounce rights that the law has established in their favor so long as the renunciation does not affect the rights of others or run contrary to the public good.[9]

When Debtor purchased the Foundry from the Parish in September 1989, the United States (not to mention a multitude of judgment creditors) had already filed numerous liens against the Debtor's property. When title to the Foundry passed to Debtor, these tax liens would (and did) attach to the Foundry. The language in the Act of Sale, by which the parties attempted to prevent confusion from extinguishing the Lease (and thereby the mortgage), even if given effect, would not affect the rights of the parties. Rather, the derogation, if given effect, would impact only the rights of the government (and Debtor's other "outsider" creditors) to the benefit of the Ross family. In addition to derogating from the law of confusion, the parties derogated from the federal laws governing the tax liens that had already been filed and that were certain to attach to the Foundry. *See* 26 U.S.C. § 6321. This Court therefore agrees with the Bankruptcy Court that the language in the Act of Sale relied upon by the Ross Group is violative of Civil Code article 7 and cannot be given effect.

■ 3. *The Covenant in the Leasehold Mortgage:* The Ross Group also argues that the Act of Sale was void because Debtor, by entering into the Act of Sale, violated certain covenants under the Leasehold Mortgage. Specifically, Debtor agreed in the Leasehold Mortgage that it would not surrender the Leasehold, terminate the Lease, or modify the Lease without the Ross Group's consent. The Leasehold Mortgage provided that any such termination or modification would be void and without effect. The Bankruptcy Court reasoned that this argument, if followed to its logical conclusion, must result in a finding that the Foundry continues to be owned by the Parish and never formed part of the Bankruptcy Estate. The Trustee's sale of the Foundry—the very sale from which the Ross Group seeks the entire proceeds—would therefore be null and void. Consequently, the Bankruptcy Court concluded that the time for raising this argument was before the Trustee's sale, not now as a basis for claiming the proceeds for the sale.[10] This Court agrees. Moreover, this Court agrees with the United States that Debtor's breach of this covenant, while it perhaps gave rise to a cause of action against Debtor, did not render the Act of Sale void.

**B.** *Whether the Leasehold Mortgage Covered Property Other Than the Leasehold:*

■ The Ross Group argues, alternatively, that, in the event confusion is found to have extinguished the Lease, this Court should determine whether the Leasehold Mortgage encumbered any assets other than the Leasehold—*i.e.,* whether the Leasehold Mortgage attached to anything that was not extinguished by confusion. The Ross Group urges that although most of the mortgaged assets were acquired with funds from the industrial revenue bond issue and therefore leased from the Parish, other items were purchased after the bond issue and were owned by Debtor at the time the Leasehold Mortgage was executed. The Ross Group argues that it should at least receive the proceeds allocable to these corporeal mova-

---

**9.** The Ross Group, in oral argument, asserted that the Bankruptcy Court erroneously relied upon the predecessor to article 7 (former article 11). According to the Ross Group, article 7 as revised does not prohibit parties from affecting the rights of others by derogating from laws, so long as the derogation does not run contrary to the public good. This argument is without merit. The 1987 Revision Comments make clear that the "rights of others" language in former article 11 was not retained because it was "*self-evident.*"

*See* La.Civ.Code Ann. art. 7, comment (c) (West 1992).

**10.** The Ross Group argues on appeal that it did raise this argument before the sale. Assuming this to be so, the sale became final more than two years ago. The time for appealing the Bankruptcy Court's order approving the sale has long past.

bles.[11] This argument cannot succeed. Even if the Leasehold Mortgage purports to encumber corporeal movables, this language is without effect because movables, as a matter of law, are not susceptible of mortgage. La.Civ.Code Ann. art. 3286 (West 1994).[12] The Ross Group points to the Declaration of Immobilization, executed by Debtor, which purports to declare immovable certain items of equipment. This Declaration, however, was executed on February 5, 1987, several months after the Leasehold Mortgage. It therefore had no effect on the status of the movable items allegedly owned by Debtor at the time the Leasehold Mortgage was executed. Accordingly, the Court can find no basis for concluding that the Leasehold Mortgage attached to any assets outside the Leasehold.

### C. *Allocation of Proceeds Between the Foundry and the Rolling Mill:*

Finally, the Ross Group urges this Court to examine the Bankruptcy Court's order, in October 1992, allocating the sale proceeds between the Foundry and the Rolling Mill. The Court need not address this issue, however, because the Ross Group has no interest in the Foundry proceeds, and the United States (the only party before this Court who does have an interest in the Foundry proceeds) does not join in the Ross Group's request for a reallocation. Moreover, the Court agrees with Central Progressive Bank that the time for appealing this order has long since past.

For the foregoing reasons, the judgment of the Bankruptcy Court is AFFIRMED.

---

11. The Bankruptcy Court's opinion does not address this argument, and it is unclear whether the argument was raised before the Bankruptcy Court.

12. The exception to this rule, of course, is the "chattel mortgage." *See* La.Rev.Stat.Ann. §§ 9:5351–5366.2 (West 1991 & Supp.1996).